**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BAXTER HEALTHCARE CORPORATION, *Plaintiff*, v. ENDO VENTURES LIMITED, PAR STERILE PRODUCTS, LLC, and NEVAKAR INJECTABLES, INC., *Defendants*. | C.A. No. 21-1184-CJB |
| ENDO VENTURES LIMITED, PAR STERILE PRODUCTS, LLC, and NEVAKAR INJECTABLES, INC., *Plaintiffs*, v. BAXTER HEALTHCARE CORPORATION, *Defendant*. | C.A. No. 21-1186-CJB |

## <u>JOINT CLAIM CONSTRUCTION BRIEF</u>

Steven J. Fineman (#4025)
Kelly E. Farnan (#4395)
Nicole K. Pedi (#6236)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
fineman@rlf.com
farnan@rlf.com
pedi@rlf.com

*Attorneys for Endo Ventures Limited,*
*Par Sterile Products, LLC and Nevakar*
*Injectables, Inc.*

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Baxter Healthcare Corporation.*

OF COUNSEL:

David H. Silverstein
Ross E. Blau
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street, 22nd Floor
New York, NY 10036
(212) 728-2200

Aziz Burgy
Ashton Copeland
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700


Dated:  July 29, 2022

OF COUNSEL:

William A. Rakoczy
Paul J. Molino
Tara M. Raghavan
Conly S. Wythers
Steven J. Birkos
Greg L. Goldblatt
RAKOCZY MOLINO MAZZOCHI
SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 222-6300

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................... vi

I.     INTRODUCTION AND BACKGROUND ....................................................1

     1.     Endo's Opening Position .......................................................................1

     2.     Baxter's Answering Position ................................................................2

     3.     Endo's Reply Position............................................................................3

     4.     Baxter's Sur-Reply Position .................................................................4

II.     AGREED-UPON CONSTRUCTIONS ...................................................4

A.     "substantially free of antioxidants".......................................................4

III.     DISPUTED CONSTRUCTIONS .............................................................5

A.     "chelating agent"....................................................................................5

     1.     Endo's Opening Position .......................................................................5

          a.     Endo's proposed construction comports with both the intrinsic evidence and the understanding of a POSA..............................................................5

          b.     Baxter's proposed construction improperly narrows the scope of the term and is unsupported by the intrinsic evidence. ................................................6

     2.     Baxter's Answering Position ................................................................7

          a.     Background. ...............................................................................................7

          b.     Baxter's Proposed Construction Is Consistent with the Ordinary and Customary Meaning of "Chelating Agent."................................................8

          c.     The Claims Dictate That "Chelating Agent" Is a Separate Chemical Compound from the Other Components of the Claimed Formulation. .....10

          d.     "Further Comprises" and Additional Claim Language Confirm That a "Chelating Agent" Is a Separate Chemical Compound, Added to the Composition............................................................................................11

          e.     The Common Specification Also Confirms That a "Chelating Agent" Is a Separate Component, Added to the Composition.....................................13

i

f.      The prosecution history also indicates that a "chelating agent" is a separate chemical compound, added to the composition. ........................................16

g.      Endo's Proposed Construction Is Nothing More Than a List of Examples, Ignores the Express Claim Language, and Improperly Refers to Examples in Lieu of Defining the Term. ....................................................19

3.      Endo's Reply Position. ..........................................................20

a.      The claim language does not require that the chelating agent be a "separate chemical compound." ....................................21

b.      The Specification does not require that the chelating agent be a "separate chemical compound." ....................................22

c.      The prosecution history does not require that the chelating agent be a "separate chemical compound." ...................................24

d.      Endo's proposed construction should be adopted. .....................................25

4.      Baxter's Sur-Reply Position ....................................................26

a.      Endo Has No Answer to Baxter's Federal Circuit Precedent Regarding the Express Claim Language. ....................................26

b.      Endo's Arguments Regarding Baxter's Specification Evidence Fail. .......29

c.      Endo's Arguments Regarding Baxter's Prosecution History Evidence Fail. ....................................................31

B.      "antioxidants" .....................................................................31

1.      Endo's Opening Position ........................................................31

a.      Endo's proposed construction reflects how a POSA would understand the term in light of the intrinsic evidence and knowledge in the art. ...............32

b.      Baxter's proposed construction is unsupported by the intrinsic evidence and expands the scope of the term far broader than what a POSA would understand it to be. ....................................................34

2.      Baxter's Answering Position ....................................................35

a.      Background. ............................................................35

b.      Baxter's Proposed Construction Applies the Ordinary and Customary Meaning of "Antioxidants." ....................................36

c.      Baxter's Proposed Construction Is Consistent with Intrinsic Evidence. ...36

d.      Par's Prior Art Patent Also Supports Baxter's Proposed Construction. ....37

e.      Endo's Proposed Construction Is Unsupported by the Intrinsic Evidence and Improperly Incorporates Extrinsic Evidence. ....................................38

3.      Endo's Reply Position..........................................................................40

a.      Endo's proposed construction properly focuses on how POSAs commonly understood the term.................................................................41

b.      The Handbook is a useful authority for understanding the plain meaning of "antioxidants." ...........................................................................42

c.      Baxter's tangential attacks on Endo's construction are contrary to the law and facts. .......................................................................................43

4.      Baxter's Sur-Reply Position ................................................................44

C.      "tonicity agent" / "tonicity adjusting agent"......................................................45

1.      Endo's Opening Position .....................................................................45

a.      Endo's proposed construction is consistent with the intrinsic evidence and reflects the understanding of a POSA........................................................46

2.      Baxter's proposed construction is inconsistent with aPOSA's understanding and unsupported by the intrinsic evidence......................................................47

3.      Baxter's Answering Position ...............................................................47

a.      Background. ..............................................................................48

b.      Baxter's Proposed Construction Is Consistent with the Ordinary and Customary Meaning of "Tonicity Agent" / "Tonicity Adjusting Agent.".48

c.      The Claim Language Confirms That "Tonicity Agent" / "Tonicity Adjusting Agent" Is a Separate Compound, Added to the Composition...49

d.      The Common Specification Also Indicates That "Tonicity Agent" / "Tonicity Adjusting Agent" Is a Separate Compound, Added to the Composition..............................................................................50

e.      Endo's Proposed Circular Construction Is Unsupported by the Intrinsic Evidence and Improperly Incorporates Extrinsic Evidence.....................50

4.      Endo's Reply Position..........................................................................52

5.      Baxter's Sur-Reply Position .................................................................53

D.  "large volume, polymeric, semi-permeable infusion container" .........................55

    1.  Endo's Opening Position .........................................................................55

        a.  Endo's proposed construction is derived from the intrinsic evidence and aligns with a POSA's understanding of the term.........................................55

        b.  A POSA would understand the meaning of the term with reasonable certainty.........................................................................56

    2.  Baxter's Answering Position .........................................................................56

        a.  Background. .........................................................................56

        b.  Endo's Proposed Construction Maintains Ambiguity. .............................57

    3.  Endo's Reply Position.........................................................................57

    4.  Baxter's Sur-Reply Position .........................................................................58

E.  "norepinephrine" / "norpepinephrine" .........................................................................58

    1.  Endo's Opening Position .........................................................................58

        a.  Endo's proposed construction is consistent with the deliberately chosen wording of the claims.........................................................58

        b.  Baxter's proposed construction ignores the patentees' claim language. ...60

    2.  Baxter's Answering Position .........................................................................60

        a.  Background. .........................................................................60

        b.  Baxter's Proposed Construction Directly Applies The Common Specification's Lexicography. ........................................................61

        c.  Endo's Proposed Construction Ignores This Lexicography. ...................61

    3.  Endo's Reply Position.........................................................................62

    4.  Baxter's Sur-Reply Position .........................................................................63

F.  Range Terms .........................................................................63

    1.  Endo's Opening Position .........................................................................63

        a.  Endo's proposed constructions align with the intrinsic evidence, including the relevant and express disclosures in the Specification. .........................65

         b.      Baxter's proposed constructions directly conflict with the intrinsic evidence and should be rejected. ...............................................66

2.      Baxter's Answering Position ......................................................67

         a.      Background ........................................................67

         b.      Baxter's Proposed Constructions Establish Numerical Precision. ............68

         c.      Endo's Proposed Construction Incorporates Ambiguity. .........................70

3.      Endo's Reply Position...........................................................71

4.      Baxter's Sur-Reply Position .................................................72

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
    350 F.3d 1365 (Fed. Cir. 2003).................................................................24

*Abbott Lab. v. Novopharm Ltd.*,
    323 F.3d 1324 (Fed. Cir. 2003).................................................................13

*Abbott Labs. v. Dey, L.P.*,
    287 F.3d 1097 (Fed. Cir. 2002).................................................43, 66, 71

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003).................................................40, 43, 52

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
    616 F.3d 1283 (Fed. Cir. 2010).................................................66, 67, 71

*Am. Radio LLC v. Qualcomm Inc.*,
    578 F. App'x 975 (Fed. Cir. 2014) ..........................................................41

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*,
    448 F.3d 1324 (Fed. Cir. 2006).........................................................23, 30

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
    359 F.3d 1367 (Fed. Cir. 2004).................................................................56

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
    616 F.3d 1249 (Fed. Cir. 2010)...................................................... passim

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
    713 F.3d 1090 (Fed. Cir. 2013).........................................................18, 25

*Biogen MA Inc. v. EMD Serono, Inc.*,
    976 F.3d 1326 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 87 (2021).......................62

*Bracco Diagnostics Inc. v. Maia Pharms., Inc.*,
    839 F. App'x 479 (Fed. Cir. 2020) ..........................................................31

*Braintree Lab'ys Inc. v. Novel Lab'ys, Inc.*,
    749 F.3d 1349 (Fed. Cir. 2014).................................................................61

*Cannon Rubber Ltd. v. The First Years, Inc.*,
    163 F. App'x 870 (Fed. Cir. 2005) ..........................................................23

*Cohesive Techs., Inc. v. Waters Corp.*,
    543 F.3d 1351 (Fed. Cir. 2008).........................................................59, 62

*Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*,
    838 F. App'x 551 (Fed. Cir. 2021) ....................................................................11

*CyDex Pharm., Inc. v. Alembic Global Holding SA*,
    No. 19-956, 2020 WL 6393918 (D. Del. Nov. 2, 2020) ........................................55

*David Netzer Consulting Eng'r LLC v. Shell Oil Co.*,
    824 F.3d 989 (Fed. Cir. 2016) ...........................................................12, 22, 49

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
    No. 06-1017, 2008 WL 2410420 (S.D. Ind. June 11, 2008) ..................38, 50, 53, 54

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
    423 F.3d 1343 (Fed. Cir. 2005) ...........................................................33, 38, 51

*Fresenius Kabi USA, LLC v. Fera Pharm., LLC*,
    No. 15-cv-3654 (KM)(MAH), 2016 WL 5109142 (D.N.J. Sept. 20, 2016) ........................66

*Fuji Photo Film Co., Ltd. v. Int'l Trade Comm'n*,
    386 F.3d 1095 (Fed. Cir. 2004) ...........................................................18, 25

*In re Gabapentin Patent Litig.*,
    503 F.3d 1254 (Fed. Cir. 2007) ....................................................................59

*GE v. ITC*,
    685 F.3d 1034 (Fed. Cir. 2012) ...........................................................59, 62

*Gibbs v. Triumph Trap Co.*,
    26 F.2d 312 (C.C.A. 2d Cir. 1928) (L. Hand, J.) ....................................................23

*Harris Corp. v. IXYS Corp.*,
    114 F.3d 1149 (Fed. Cir. 1997) ...........................................................40, 43, 52

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
    909 F.2d 1464 (Fed. Cir. 1990) ...........................................................3, 24

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
    381 F.3d 1352 (Fed. Cir. 2004) ...........................................................7, 47

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
    701 F. App'x 978 (Fed. Cir. 2017) ...........................................................11, 22

*HTC Corp. v. IPCom GmbH & Co.*,
    667 F.3d 1270 (Fed. Cir. 2012) ...........................................................12, 14, 22, 49

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001) ...........................................................11, 26, 58, 71

*InterDigital Commc'ns, LLC v. ITC*,
    690 F.3d 1318 (Fed. Cir. 2012)......................................................................... passim

*Jeneric/Pentron, Inc. v. Dillon Co.*,
    205 F.3d 1377 (Fed. Cir. 2000)....................................................................68, 70, 72

*Kustom Signals, Inc. v. Applied Concepts, Inc.*,
    264 F.3d 1326 (Fed. Cir. 2001)...........................................................................60, 63

*Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings, Inc.*,
    No. 16-538, 2017 WL 4681328 (W.D. Pa. Oct. 18, 2017).........................19, 23, 57

*Lecat's Ventriloscope v. MT Tool & Mfg.*,
    283 F. Supp. 3d 702 (N.D. Ill. 2008) ...........................................................40, 43, 52

*Liquid Dynamics Corp. v. Vaughan Co.*,
    355 F.3d 1361 (Fed. Cir. 2004).................................................................................2, 39

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009)...................................................................................62

*In re Maxim Integrated Prods., Inc.*,
    MDL No. 2354, 2013 WL 6628762 (W.D. Pa. Oct. 9, 2013) ...........................19, 57

*Merck & Co. v. Teva Pharm. USA, Inc.*,
    347 F.3d 1367 (Fed. Cir. 2003)....................................................................................25

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014).....................................................................................................56

*Novartis Pharm. Corp. v. Par Pharm., Inc.*,
    No. 11-1077-RGA, 2014 WL 4364674 (D. Del. Aug. 29, 2014) .........................23, 40, 44, 46

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)....................................................................................35

*Oplus Techs., Ltd. v. Sears Holding Corp.*,
    No. 12-5707, 2013 WL 11521845 (C.D. Cal. Jan. 14, 2013) ...........................19, 57

*Osram GmbH v. ITC*,
    505 F.3d 1351 (Fed. Cir. 2007)....................................................................................66

*Par Pharm., Inc. v. Hospira, Inc.*,
    No. 17-cv-00944 (D. Del. July 13, 2017) ...................................................................38

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)........................................................ passim

*Powell v. Home Depot U.S.A., Inc.*,
   663 F.3d 1221 (Fed. Cir. 2011)..................................................................6, 7, 18, 19

*Purdue Pharm. Prods. L.P. v. Actavis Elizabeth LLC*,
   No. 12-5311, 2015 WL 5032650 (D.N.J. Aug. 25, 2015) ............................... passim

*Resonate Inc. v. Alteon Websystems, Inc.*,
   338 F.3d 1360 (Fed. Cir. 2003)..............................................................................60, 63

*ResQNet.com, Inc. v. Lansa, Inc.*,
   346 F.3d 1374 (Fed. Cir. 2003)......................................................................................43

*SkinMedica, Inc. v. Histogen Inc.*,
   727 F.3d 1187 (Fed. Cir. 2013)......................................................................................60

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005)..................................................................................3, 22

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*,
   753 F.3d 1291 (Fed. Cir. 2014)..............................................................................47, 53

*Symantec Corp. v. Comput. Assocs. Int'l, Inc.*,
   522 F.3d 1279 (Fed. Cir. 2008)......................................................................................34

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*,
   743 F.3d 1359 (Fed. Cir. 2014)......................................................................68, 69, 72

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ............................................................................ passim

*Thorn EMI N. Am., Inc. v. Intel Corp.*,
   936 F. Supp. 1186 (D. Del. 1996), *aff'd*, 157 F.3d 887 (Fed. Cir. 1998) ...............66

*TorPharm, Inc. v. Ranbaxy Pharm., Inc.*,
   336 F.3d 1322 (Fed. Cir. 2003)......................................................................................24

*Toshiba Corp. v. Imation Corp.*,
   681 F.3d 1358 (Fed. Cir. 2012)..................................................................................6, 46

*Transcenic, Inc. v. Google Inc.*,
   7 F. Supp. 3d 405 (D. Del. 2013)..............................................................................19, 57

*Trs. of Columbia Univ. v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016)......................................................................................43

*U.S. Philips Corp. v. Iwasaki Elec. Co.*,
   505 F.3d 1371 (Fed. Cir. 2007)..............................................................................66, 71

*Univ. of Fla. Rsch. Found. v. Motorola Mobility LLC*,
    3 F. Supp. 3d 1374 (S.D. Fla. 2014) ...........................................................................40, 44, 52

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..............................................................................................38, 41

*Wasica Fin. GmbH v. Schrader Int'l, Inc.*,
    No. 13-1353-LPS, 2019 WL 1011321 (D. Del. Mar. 4, 2019)................................................23

*Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*,
    777 F. App'x 495 (Fed. Cir. 2019) ........................................................................................11

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
    442 F.3d 1322 (Fed. Cir. 2006)...............................................................................................28

## I.     INTRODUCTION AND BACKGROUND

### 1.     Endo's Opening Position

Pursuant to the Court's Stipulated Scheduling Order (No. 21-1184, D.I. 18; No. 21-1186, D.I. 17), as amended on April 7, 2022 (No. 21-1184, D.I. 38; No. 21-1186, D.I. 36), Endo Ventures Limited; Par Sterile Products, LLC; and Nevakar Injectables, Inc. (collectively, "Endo") submits the following opening claim construction brief concerning U.S. Patent Nos. 10,420,735 (the "'735 patent"); 10,471,026 (the "'026 patent"); 10,568,850 (the "'850 patent"); 10,646,458 (the "'458 patent"); 10,159,657 (the "'657 patent"); and 10,226,436 (the "'436 patent") (collectively, the "Patents-in-Suit").[1]

As the common specification of the Patents-in-Suit (the "Specification") describes, Endo's invention addressed the "need for improved stable, low concentration, ready-to-inject and antioxidant free norepinephrine formulations, and methods of manufacturing and storing the same." '735 patent at 3:45-48.  Problems in the prior art that were recognized and addressed by the inventors include oxidative degradation of norepinephrine, isomerization of norepinephrine to an inactive isomer at certain pH ranges, and low storage stability. *Id*. at 3:15-44.

Endo's[2] proposed constructions of the disputed terms of the Patents-in-Suit should be adopted because they provide necessary and well-supported clarity as to the meaning of those terms.  In line with the canons of claim construction, Endo's proposed constructions "stay true[] to the claim language and most naturally align with the patent's description of the invention,"

---

[1] Endo has asserted claims 1, 3-16, and 18-22 of the '735 patent; claims 1-11 and 15-16 of the '026 patent; claims 1-7, 9-14, and 17-19 of the '850 patent; and claims 1-2, 4-11, 14-17, 20-23 of the '458 patent.  Only Baxter has pled causes of action on the '657 and '436 patents.  As the court is aware the '657 and '436 patent are no longer part of the cases.

[2] Endo is the patentee of the Patents-in-Suit.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc), and are entirely supported by the intrinsic evidence in light of the knowledge in the art as of the time of the Patents-in-Suit.

Conversely, Baxter Healthcare Corporation's ("Baxter's") proposed constructions should be rejected because they lack adequate support from—and often conflict with—both the intrinsic evidence and the knowledge in the art, and instead impermissibly broaden (or, in the case of the Range Terms, impermissibly narrow) the meaning of the disputed terms. Adoption of Baxter's litigation-driven constructions would be contrary to the goals of claim construction, including "assign[ing] a fixed, unambiguous, legally operative meaning to the claim[s]." *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004).

2.      **Baxter's Answering Position**

Endo cannot dispute that prior art norepinephrine bitartrate compositions were widely in use decades prior to the Patents-in-Suit. *See, e.g.*, the '735 patent at 2:1-35. To avoid a crowded field of prior art, Endo had no choice but to seek claims to a norepinephrine composition requiring very specific ingredients, "***norepinephrine*** or a salt thereof", an "aqueous acidic solution," a "***chelating agent***," and a "***tonicity agent***," each added separately in specific concentration ***ranges***, where the composition is "substantially free of ***antioxidants***."

Baxter's constructions of the disputed claim terms should be adopted because they reflect the ordinary meaning of the terms, find direct support in the intrinsic evidence, and are consistent with long-held canons of claim construction. On the other hand, Endo's constructions not only lack intrinsic evidence support, they reflect a blatant attempt to avoid infringement proof problems. Endo, for example, concedes that it cannot prove infringement under Baxter's construction of "***chelating agent***." Thus, Endo construction offers a list of examples rather than a definition. To make matters worse, Endo's construction (1) ignores express claim language treating "norepinephrine or a salt thereof" and the "chelating agent" as separate components; (2) ensnares

prior art norepinephrine bitartrate; and (3) implausibly has "norepinephrine or a salt thereof" do double duty as both the prior art drug and as the "chelating agent" meant to stabilize that drug. Many of Endo's other constructions are circular and rely exclusively on extrinsic evidence in contravention of the intrinsic evidence and precedent.  Endo's constructions should be rejected.

### 3.   Endo's Reply Position

By advancing arguments to avoid infringement, Baxter attempts to turn the claim construction process into summary judgment briefing on noninfringement.  That, of course, is not the purpose of claim construction.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1339-40 (Fed. Cir. 2005) ("[A] court must construe claims without considering the implications of covering a particular product or process.").  To achieve its goal, Baxter's proposed constructions add in limitations that are unsupported by the intrinsic evidence, particularly limitations that attempt to define components of the claimed compositions based on their function rather than their identity.  Its proposed construction of "tonicity agent," for example, would define the term based on the function of "increas[ing] the osmolality of the composition" rather than simply whether a given excipient is commonly understood to be a tonicity agent.  Reading in such functional limitations to the components of the claimed composition is improper and opens the door for Baxter to contort the claimed compounds into things the inventors never intended.  *Cf. Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) ("[A]pparatus claims cover what a device is, not what a device does.").

Baxter's constructions should be rejected.  Conversely, Endo's proposed constructions should be adopted because they stay true to the claim language, the intrinsic evidence, and the understanding of a POSA.

#### 4.        Baxter's Sur-Reply Position

Endo finds itself without a sound, substantive answer to Baxter's simple, common sense construction that separately-listed claim components must be construed to be separate chemical compounds.   Cornered, Endo manufactures a new argument that Baxter's "chelating agent" construction is ambiguous because Endo finds the use of "separate" confusing.  Yet, in its opening position, Endo conceded that it understood what the "chelating agent" was separate from when it stated, "under Baxter's construction, the anion of the claimed 'norepinephrine or a salt thereof' could not serve as the claimed 'chelating agent' because it is not a 'separate chemical compound' from the norepinephrine salt."  *Infra* at 6.

With respect to "tonicity agent" and "antioxidants," as with "chelating agent," Endo does not dispute that these terms have plain and ordinary meanings, but Endo does not want to be bound by what those meanings ***actually are***.  Instead, Endo attempts to walk back from its original narrow constructions directed solely to ***examples in the Handbook*** and relies on unhelpful and circular definitions:   a tonicity agent is a ***common tonicity agent*** and an antioxidant is a ***common antioxidant***.  These are less constructions than guessing games.  Endo similarly fails to explain why the specification's examples provide any clarity as to the term "semi-permeable" in "large volume, polymeric, semi-permeable infusion container." Endo also sidesteps the patent's lexicography for the "norepinephrine" term and that the Range Terms are not modified by "about."

## II.    AGREED-UPON CONSTRUCTIONS

## A.    "substantially free of antioxidants"

The parties agree on the meaning of this term and respectfully submit that the term "substantially free of antioxidants" should be construed to mean: "does not include antioxidants in an amount effective to reduce degradation of total norepinephrine by at least 1% when stored over a period of at least three months at 25° C."

4

## III.     DISPUTED CONSTRUCTIONS

### A.     "chelating agent"

#### 1.     Endo's Opening Position

The term "chelating agent" is recited in claims 1 and 6-9 of the '657 patent; claims 1, 3-4, and 13 of the '436 patent; claims 1, 7-8, and 14 of the '735 patent; claims 1 and 11-15 of the '026 patent; claims 1 and 14-15 of the '850 patent; and claims 1 and 17-18 of the '458 patent.

The parties have proposed the following constructions:

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "includes various bicarboxylic acids, tricarboxylic acids, and aminopolycarboxylic acids such as ethylenediaminetetraacetic acid (EDTA), ethylene glycol-bis(β-aminoethyl ether)-N,N,N',N'-tetraacetic acid (EGTA), and penta(carboxymethyl)diethylenetriamine (DTPA), and salts and hydrates thereof" | "a separate chemical compound, added to the composition, with at least two donor groups that form a ring structure with a metal ion" |

#### a.     Endo's proposed construction comports with both the intrinsic evidence and the understanding of a POSA.

Endo's proposed construction should be adopted because it is derived directly from the Specification and aligns with a POSA's understanding of chelating agents. *InterDigital*, 690 F.3d at 1324.

The Specification discloses that "[w]ith respect to the chelating agent it is contemplated that such agents are a bicarboxylic acid (e.g., optionally hydroxylated, tartrate), a tricarboxylic acid (e.g., aconitic acid, trimesic acid, citric acid), and/or an aminopolycarboxylic acid (e.g., EDTA, EGTA, etc.) . . . ." '735 patent at 4:67-5:6. The Specification goes on to provide the following examples of chelating agents: "various bicarboxylic acids, tricarboxylic acids, and aminopolycarboxylic acids such as ethylenediaminetetraacetic acid (EDTA), ethylene glycol-bis(β-aminoethyl     ether)-N,N,N',N'-tetraacetic     acid     (EGTA),     and

5

penta(carboxymethyl)diethylenetriamine (DTPA), and salts and hydrates thereof." *Id*. at 6:57-63.

It was also recognized, and continues to be recognized, in the art that each of those exemplary

compounds functions as a chelating agent.  Buckton Decl. ¶¶ 39-40.

There is no suggestion in the intrinsic evidence that the patentees intended for "chelating

agent" to have a meaning other than that conveyed in the Specification.  Endo's construction

should therefore be adopted.  *Toshiba*, 681 F.3d at 1369.

      **b.**      <u>**Baxter's proposed construction improperly narrows the scope of the**</u>
<u>**term and is unsupported by the intrinsic evidence.**</u>

Baxter's proposed construction adds, without evidentiary support, a requirement that the

chelating agent must be a "separate chemical compound, added to the composition."  For example,

under Baxter's construction, the anion of the claimed "norepinephrine or a salt thereof" could not

serve as the claimed "chelating agent" because it is not a "separate chemical compound" from the

norepinephrine salt.  Such an interpretation has no support in the intrinsic evidence and must be

rejected.  *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011).

As mentioned above, the Specification recites numerous examples of chelating agents,

including "bicarboxylic acids . . . and salts and hydrates thereof."  ('735 patent at 6:57-63.)  A

POSA would have known that one example of a bicarboxylic acid (i.e., an acid having two

carboxyl groups) is tartaric acid, shown below with the carboxylic acid groups boxed in red:



Buckton Decl. ¶ 41.  A POSA would have also known that bitartrate salts are salts of tartaric

acid, and are understood to function as chelating agents.  Buckton Decl. ¶ 42.  The Specification

expressly discloses tartrate as an example of a bicarboxylic acid that can serve as the claimed

chelating agent, ('735 patent at 4:67-5:2), and further recites that norepinephrine "may be a salt of any suitable and pharmaceutically acceptable form, including . . . organic salts (e.g., bitartrate)." *Id*. at 6:24-27.  Thus, the claimed norepinephrine can be "provided as the norepinephrine bitartrate salt," (*id*. at 6:35-37), with the bitartrate anion serving as the claimed chelating agent.  *See Powell*, 663 F.3d at 1231-32 (claim's listing of components as separate elements does not imply that components must be physically separate).  The patentees also acknowledged that bitartrate, even when provided as norepinephrine bitartrate, can serve other functions in the composition.  *See*, *e.g.*, '735 patent at 6:34-42 (discussing "weak buffer" functionality of bitartrate "provided as the norepinephrine bitartrate salt").

Because there is no "clear disavowal or contrary definition" in the intrinsic evidence, the term "chelating agent" should be construed to carry its full scope and not narrowed to only "separate chemical compound[s]" as Baxter proposes.  *Home Diagnostics*, 381 F.3d at 1358.

### 2.     Baxter's Answering Position

Baxter's proposed construction for "chelating agent" reflects its ordinary and customary meaning and is wholly supported by the intrinsic evidence.  In contrast, Endo improperly offers examples as its proposed "construction."

### a.     <u>Background.</u>

Norepinephrine is an old drug, commonly and widely used for decades.  As even the Patents-in-Suit readily concede, norepinephrine bitartrate was previously marketed as Levophed®—which "contains sodium metabisulfite as an antioxidant"—and as another product "free of sodium metabisulfite."  '735 patent at 2:1-20.  According to the common specification, the use of "sodium metabisulfite" in Levophed® resulted in a warning label due to associated allergic type reactions, including anaphylactic shock.  *Id.* at 2:15-20.  The specification also asserts that prior art products exhibited stability concerns upon dilution, including "significant

7

degradation" of norepinephrine bitartrate.  *Id.* at 3:15-17.  In an attempt to improve upon the prior art, Endo specifically contemplated removing the sodium metabisulfite antioxidant and adding a separate component, a "chelating agent," to provide long term stability to the norepinephrine bitartrate in solution.  In other words, the use of a "chelating agent" is at the crux of Endo's alleged invention.

The term "chelating agent" appears throughout the patent claims.  *See, e.g.*, '657 patent at claims 1, 6-9; '436 patent at claims 1, 3-4, 13; '735 patent at claims 1, 7-8, 14; '026 patent at claims 1, 11-12, 14-15; '850 patent at claims 1, 14-15; '458 patent at claims 1, 17-18.  The parties have proposed the following constructions for the term:

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "includes various bicarboxylic acids, tricarboxylic acids, and aminopolycarboxylic acids such as ethylenediaminetetraacetic acid (EDTA), ethylene glycol-bis(β-aminoethyl ether)-N,N,N',N'-tetraacetic acid (EGTA), and penta(carboxymethyl)diethylenetriamine (DTPA), and salts and hydrates thereof" | "a separate chemical compound, added to the composition, with at least two donor groups that form a ring structure with a metal ion" |

> **b.** **Baxter's Proposed Construction Is Consistent with the Ordinary and Customary Meaning of "Chelating Agent."**

A skilled artisan would understand that a "chelating agent" have the elemental functionality of a "chelating agent," namely sequester or isolate metals by virtue of having "at least two donor groups that form a ring structure with a metal ion."  This is basic, unrefuted chemistry.  Const. Decl. ¶ 32.  The common specification fully supports this ordinary and customary meaning:

> [T]he formulation will also include one or more chelating agents, and particularly ***metal ion chelators***.  For example, suitable chelators include various bicarboxylic acids, tricarboxylic acids, and aminopolycarboxylic acids such as ethylenediaminetetraacetic acid (EDTA), ethylene glycol-bis(β-aminoethyl ether)-N,N,N′,N′-tetraacetic acid (EGTA), and penta(carboxymethyl)diethylenetriamine (DTPA), and salts and hydrates thereof.  While not limiting to the inventive subject matter,

8

> it is contemplated that the ***metal ion chelators*** will slow down both the baseline and ***metal ion-stimulated autoxidation of norepinephrine***.  Remarkably, the inventors unexpectedly observed that the desirable effect of the chelators was observable at relatively low concentrations of the chelators.  For example, ***reduction of*** the baseline and ***metal ion-stimulated autoxidation of norepinephrine*** was observed at chelator concentrations of between 1 μg/ml and 10 μg/ml, and between 10 μg/ml and 100 μg/ml.

'735 patent at 6:55 – 7:5.  In order for a "chelating agent" to reduce "metal ion-stimulated autoxidation of norepinephrine," it must contain "at least two donor groups that form a ring structure with a metal ion."  Const. Decl. ¶ 33.  It thus comes as no surprise that each of the exemplary chelators identified above (e.g., EDTA, EGTA, and DPTA) includes "at least two donor groups that form a ring structure with a metal ion."  *Id*.  The extrinsic evidence confirms the ordinary and customary understanding that chelators necessarily form a ring structure with a metal ion using at least two donor groups.  *See id.* ¶ 32 (citing Remington's 1985 at 170 ("Chelates consist of a partial ring of atoms which close up by holding a given atom, usually a metal, in a molecular claw.  The compounds capable of forming a ring structure with a metal are designated as *ligands*."); Textbook of Drug Design and Discovery 2002 at 371 ("Ligands (Lewis bases) with several binding sites are called polydentate ligands (chelates) and form particularly stabile complexes:  metal-chelates.  The most advantageous situation occurs when 5- or 6-membered rings can be formed."); Chemistry: Science of Change 1990 at I-6 (defining "chelates" as "[c]oordination complexes in which a ligand coordinates through two or more donors to the same central atom"); *see also* Hawley's 2007 at 1358; Ansel 1995 at 112.  Although Endo's expert recognizes that a chelating agent has this functionality ("they interact with metal ions through ionic interactions," Buckton Decl, ¶ 40), Endo rejects Baxter's scientifically sound construction in favor of a non-definition.  As described below, *infra* at 19-20, Endo's listing of examples is improper; Baxter's construction based on the ordinary understanding of "chelating agent" should be adopted.

9

       c.      **The Claims Dictate That "Chelating Agent" Is a Separate Chemical Compound from the Other Components of the Claimed Formulation.**

Based on the language of the claims, which list the components of the claimed composition separately, Baxter's construction also logically requires that the "chelating agent" is "a separate chemical compound, added to the composition."  Representative claim 1 of the '735 patent recites:

> 1. A method of treating hypotension, comprising:
> administering a ready-to-administer norepinephrine composition at an initial dose per minute;
> administering the norepinephrine composition at a maintenance dose per minute, wherein the initial dose per minute is greater than the maintenance dose per minute;
> wherein the initial dose per minute is a dose of between 8 and 12 µg/min, and wherein the maintenance dose per minute is a dose of between 2 and 4 µg/min;
> wherein the norepinephrine composition comprises norepinephrine or a salt thereof at a concentration of between 10 µg/ml and 100 µg/ml in an aqueous acidic solution having a pH range of between 3.7 and 4.3, wherein the aqueous acidic solution further comprises a chelating agent at a concentration of between 1 µg/ml and 100 µg/ml and a tonicity agent;
> wherein the norepinephrine composition is substantially free of antioxidants; and
> wherein the norepinephrine or a salt thereof in the norepinephrine composition comprises at least about 90% R-isomer of norepinephrine after storage at 25±2° C. and 60±5% relative humidity, over at least three months as determined by HPLC.

As is evident from the representative claim, the Patents-in-Suit claim norepinephrine compositions that comprise separate chemical compounds or components that are added to the claimed "norepinephrine composition," namely (1) "norepinephrine or a salt thereof" (highlighted in yellow above); (2) "an aqueous acidic solution" (highlighted in purple above); (3) "a ***chelating agent***" (highlighted in green above); and (4) "a tonicity agent" (highlighted in blue above).  Each of the independent claims of the Patents-in-Suit follows this same pattern, albeit using slightly different terms.  See Appendix A – Highlighted Claims of Patents-in-Suit.

"Where a claim lists elements separately, 'the clear implication of the claim language is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quoting *Gaus v. Conair Corp.,* 363 F.3d 1284, 1288 (Fed. Cir. 2004); *see also HTC Corp. v. Cellular Commc'ns Equip., LLC*, 701 F. App'x 978, 982 (Fed. Cir. 2017) ("The separate naming of two structures in the claim strongly implies that the named entities are not one and the same structure."); *Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*, 777 F. App'x 495, 498-99 (Fed. Cir. 2019); *Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*, 838 F. App'x 551, 553 (Fed. Cir. 2021).   Baxter's construction is thus based on a long line of Federal Circuit precedent and the common-sense approach that when one lists separate items in the claims, as Endo did here with "norepinephrine or a salt thereof" and "chelating agent," it means that each is a separate component.

Endo's construction for "chelating agent," which rejects Baxter's treatment of the ingredients as separate components, contradicts a basic claim construction tenet because it ignores claim language, where it concedes that claim construction begins.  *See Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves . . . .").

For at least these reasons, the Court should further construe "chelating agent" as "a separate chemical compound, added to the composition," distinct from other components of the claimed composition, such as the norepinephrine or a salt thereof (e.g., norepinephrine bitartrate).

> ### d.    "Further Comprises" and Additional Claim Language Confirm That a "Chelating Agent" Is a Separate Chemical Compound, Added to the Composition.

Additional claim language further supports Baxter's construction that a "chelating agent" is "a separate chemical compound, added to the composition," distinct from "norepinephrine or a salt thereof."   For example, claim 1 of the '735 patent states "wherein the norepinephrine

composition comprises norepinephrine or a salt thereof . . . in an aqueous acidic solution" and "wherein the aqueous acidic solution ***further comprises*** a chelating agent."  '735 patent at claim 1 (emphasis added); *see also id*. at claim 14; '436 patent at claims 1, 13 ("wherein the aqueous acidic solution ***further comprises*** a chelating agent").  This express language makes it clear that a "chelating agent" is "a separate chemical compound, added to the composition," distinct from the additional ingredients within the aqueous acidic solution, e.g., "norepinephrine or a salt thereof" consistent with legal precedent.  *See*, *e.g.*, *Purdue Pharm. Prods. L.P. v. Actavis Elizabeth LLC*, No. 12-5311, 2015 WL 5032650, at *14 (D.N.J. Aug. 25, 2015) ("The phrase 'further comprising' signals that these claimed elements ('zolpidem or a pharmaceutically acceptable salt thereof,' on the one hand, and 'a buffer' on the other) are distinct components of the solid pharmaceutical composition."); *see also David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 996 (Fed. Cir. 2016) (noting process "further comprising" "a hydrotreating step" was not a part of the "fractioning step"); *HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1275 (Fed. Cir. 2012) (finding that "further comprising" signals something "additional").

Similarly, the claims of the '026 patent require "***admixing*** an R-isomer of norepinephrine or salt thereof, ***a chelating agent*** and a tonicity agent into an aqueous acidic solution," whereas the claims of the '458 patent require "***combining*** norepinephrine or a salt thereof, ***a chelating agent***, a tonicity adjusting agent, and an aqueous acidic solution."  See, *e.g.*, '026 patent at claim 1 (emphasis added); '458 patent at claim 1 (emphasis added).  A person of ordinary skill in the art considering such language would necessarily understand that the "chelating agent" must be "a separate chemical compound, added to the composition" in comparison to the other ingredients being admixed or combined, including "norepinephrine or a salt thereof."  Const. Decl. ¶ 35. Indeed, the Federal Circuit has held that where process language is employed in the claims and in

the specification, it can inform the skilled artisan as to the proper claim scope.  *Abbott Lab. v. Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir. 2003) (construing "co-micronized" or "co-micronization" to require micronizing specific ingredients together).

Reference to separate concentration ranges for "norepinephrine or a salt thereof" and the "chelating agent" within the claims further indicates that they are each separate chemical compounds, added to the composition.  *See*, *e.g.*, '735 patent at claim 1 ("norepinephrine or a salt thereof at a concentration of between 10 μg/ml and 100 μg/ml . . . chelating agent at a concentration of between 1 μg/ml and 100 μg/ml"); '735 patent at claim 14 ("norepinephrine or a salt thereof at a concentration of between 10 μg/ml and 100 μg/ml . . . chelating agent in an amount of between 1 μg/ml and 100 μg/ml");[3]  Const. Decl. ¶ 35.  In sum, the claim language unmistakably confirms that the "chelating agent" is a separate chemical compound, added to the composition, distinct from other chemical compounds like "norepinephrine or a salt thereof."

e.      **The Common Specification Also Confirms That a "Chelating Agent" Is a Separate Component, Added to the Composition.**

The common specification notes: "the inventors also contemplate a method of preparing a ready-to-inject norepinephrine composition that includes a step of formulating a liquid parenteral composition that contains in an aqueous acidic buffer norepinephrine as an R-isomer . . . . [T]he aqueous buffer will ***further comprise a chelating agent*** . . . ."  '735 patent at 4:26-37 (emphasis

---

[3] *See also* '657 patent at claim 1 ("chelating agent is an aminocarboxylic acid present in an amount of equal or less than 100 μg/ml . . . norepinephrine bitartrate dissolved at a concentration of between 16 and 64 μg/ml"); '436 patent at claim 1 ("chelating agent is present in an amount of between 1 μg/ml and 100 μg/ml . . . norepinephrine dissolved at a concentration suitable for administration to a patient in need thereof"); '026 patent at claim 1 ("chelating agent is present in an amount between 1 μg/ml and 100 μg/ml . . . concentration of norepinephrine or salt thereof is between 10 μg/ml and 100 μg/ml"); '850 patent at claim 1 ("norepinephrine or a salt thereof in an amount between 10 μg/ml and 100 μg/ml . . . chelating agent in an amount between 1 μg/ml and 100 μg/ml"); '458 patent at claim 1 ("norepinephrine or a salt thereof is present in the liquid parenteral composition in an amount of between 10 μg/ml and 100 μg/ml . . . chelating agent is present in the liquid parenteral composition in an amount of between 1 μg/ml and 100 μg/ml").

added); *see also id.* at 3:56-60 ("In one aspect of the inventive subject matter, the inventors contemplate a ready to ready-to-inject norepinephrine composition that comprises an aqueous acidic buffer having a pH range of between 3.7 and 4.3, wherein the aqueous buffer ***further comprises a chelating agent***." (emphasis added)); *id.* at 4:43-48 ("[T]he aqueous buffer ***also includes a chelating agent* . . . .**" (emphasis added)); *id.* at 9:13-14 ("***Citric acid was added*** and the solution was stirred until a homogenous solution was obtained." (emphasis added).  Again, such language confirms that the "chelating agent" is a separate chemical compound, added to the composition.  *See, e.g. Purdue*, 2015 WL 5032650, at *14; *HTC v. IPCom*, 667 F.3d at 1275.

The tables in the Patents-in-Suit disclosing exemplary formulations also indicate that a "chelating agent" is a separate ingredient.  For example, Table 6 distinguishes "norepinephrine bitartrate," the active ingredient, from "edetate sodium," the chelating agent:

TABLE 6

Formulation composition selected
for further development activities and optimization

| | Quantity (mg/mL) Formulation | | | |
|---|---|---|---|---|
| Ingredient | X | XI | XII | XIII |
| Norepinephrine Bitartrate | 0.016 | 0.016 | 0.016 | 0.016 |
| Edetate Sodium | 0.10 | 0.10 | 0.10 | 0.10 |
| Sodium chloride | 9 | 9 | 9 | 9 |
| HCl/NaOH | q.s. pH 3.5 | q.s. pH 4.0 | q.s. pH 4.5 | q.s. pH 5.0 |
| Water for Injection Q.S. | 1 mL | 1 mL | 1 mL | 1 mL |
| Dissolved Oxygen (ppm) | <1 | <1 | <1 | <1 |

'735 patent at Table 6; *see also* Table 11.  Similarly, Table 4, which Endo concedes "discloses several formulations using citric acid as the chelating agent," Endo Response to Baxter Interrogatory No. 11, identifies "norepinephrine bitartrate" as a separate ingredient from "citric

acid." '735 patent at Table 4; Birkos Decl. Ex. 1 at 7.[4]  These disclosures make it abundantly clear

that the named inventors distinguished norepinephrine bitartrate (and any anion associated with

the same in solution)[5] from the chelating agent.  This is an entirely appropriate, common sense

reading.  *See, e.g., Purdue*, 2015 WL 5032650, at *14.  As such, a skilled artisan would not

consider norepinephrine bitartrate (or any anion thereof) to be a "chelating agent."[6]  Const. Decl.

¶¶ 36, 43.

Moreover, despite the fact that every example uses norepinephrine bitartrate as the active

ingredient, the specification never once refers to that ingredient (or any anion associated with it in

solution) as a chelating agent.  While the specification contemplates that a "chelating agent" could

be, among other things, a "bicarboxylic acid (e.g. optionally hydroxylated, tartrate)," it in no way

suggests that the bitartrate anion of the active ingredient serves as a "chelating agent."  Const.

Decl. ¶ 43.

In fact, the data in the specification demonstrate that at ready-to-administer concentrations,

the bitartrate anion is insufficient to provide the purportedly stable formulation claimed.  *See* '735

patent at 3:15-17, Tables 1, 3 (disclosing stability data for formulations comprising norepinephrine

bitartrate and no chelating agent and stating "[a]s can be seen from the results, the norepinephrine

at ready-to-inject concentrations underwent significant degradation").  In other words, the data in

---

[4] *See also* '735 patent at Table 11 (distinguishing "norepinephrine bitartrate," the active ingredient, from "edetate sodium," the chelating agent).

[5] Endo asserts that the "bitartrate anion" which could form when norepinephrine bitartrate is in solution can serve as the claimed chelating agent.  *See, e.g.*, *supra* at 6-7.  Baxter disagrees.

[6]  If anything, the common specification at most describes the bitartrate as providing a weak buffering effect, not as effecting chelation.  *See, e.g.*, '735 patent at 6:35-41 ("[T]he inventors have further discovered that where the norepinephrine is provided as the norepinephrine bitartrate salt, a buffer can advantageously be omitted and the pH can be adjusted with suitable acid and/or base as is well known in the art.  Notably, the bitartrate appeared to act as a weak buffer in the stability range for the norepinephrine as is shown in more detail below.").

the patent establish that the bitartrate anion does not provide the necessary chelation.  Const. Decl. ¶ 43.  Contrary to Endo's assertions, *supra* at 6-7, a skilled artisan considering the disclosures in the common specification would not have understood that norepinephrine bitartrate, including whatever amount of bitartrate anion that may form upon disassociation of norepinephrine bitartrate in solution, acts as a "chelating agent."  *Id.*

Moreover, if the patentee wanted to expand the definition of a "chelating agent" to include norepinephrine bitartrate in solution, and that norepinephrine bitartrate is somehow self-chelating (in contravention of the common specification which teaches the use of separate agents like EDTA to stabilize norepinephrine bitartrate in solution), they could have and should have included this concept in the patent specification to put the skilled artisan on notice that their definition of "chelating agent" was broader than what is set forth in the intrinsic evidence.  Having failed to do so, Endo cannot use claim construction to broaden the scope of the patent claims.

f.   **The prosecution history also indicates that a "chelating agent" is a separate chemical compound, added to the composition.**

The prosecution history also confirms that the claimed "chelating agent" is a separate chemical compound, added to the composition, that is distinct from the "norepinephrine or a salt thereof."  During prosecution of the '735 patent, the following claim containing the language "chelating agent" was rejected as obvious over certain prior art references, including the Prescribing Information for Levophed® ("Hospira") and another reference:

16

> 1. A method of treating hypotension, comprising:
>
>    administering a ready-to-administer norepinephrine composition at an initial dose per minute;
>
>    administering the norepinephrine composition at a maintenance dose per minute, wherein the initial dose per minute is greater than the maintenance dose per minute;
>
>    wherein the initial dose per minute is a dose of between 8 and 12 μg/min, and wherein the maintenance dose per minute is a dose of between 2 and 4 μg/min;
>
>    wherein the norepinephrine composition comprises norepinephrine or a salt thereof in an aqueous acidic solution having a pH range of between 3.7 and 4.3, wherein the aqueous acidic solution further comprises a chelating agent and a tonicity agent; and
>
>    wherein the norepinephrine composition is substantially free of antioxidants.

'735 patent PH, 10/17/2018 Original Application at 25; 2/8/2019 Non-Final Rejection at 3.  The

Prescribing Information for Levophed® states:

> LEVOPHED is supplied in sterile aqueous solution in the form of the bitartrate salt to be administered by intravenous infusion following dilution. Norepinephrine is sparingly soluble in water, very slightly soluble in alcohol and ether, and readily soluble in acids. Each mL contains the equivalent of 1 mg base of norepinephrine, sodium chloride for isotonicity, and not more than 0.2 mg of sodium metabisulfite as an antioxidant. It has a pH of 3 to 4.5. The air in the vials has been displaced by nitrogen gas.

(Hospira at 1).  The examiner asserted that Hospira "does not specifically disclose the claimed

composition i.e. . . . [that] further includes a chelating agent":

> The difference between the prior art and the claims at issue is that Hospira does not specifically disclose the claimed composition, i.e., that it is substantially free of antioxidants (claims 1 and 16), the claimed concentrations (claims 4-5 and 17-18), it further includes a chelating agent (claims 8-10 and 22), or the claimed functional properties (claims 11-15 and 23-26

In response to this prior art rejection, the applicants stated the following:

> In this regard, applicant points to the experimental data that clearly establish that stability of norepinephrine is unexpectedly and significantly increased in formulations where a chelating agent and the norepinephrine are present at low concentrations (*e.g.*, norepinephrine is present in the composition at a concentration of between 10 µg/ml and 100 µg/ml and the chelating agent is present in the composition in an amount of between 1µg/ml and 100 µg/ml, specifically between 10 µg/ml and 100 µg/ml), and where the composition has a pH in the range of between 3.7 and 4.3. Moreover, the compositions as claimed herein also advantageously and surprisingly reduce

'735 patent PH, 4/2/2019 Remarks/Arguments at 7 (emphasis added). In so stating, the applicants confirmed that the "norepinephrine or a salt thereof" present in that composition cannot be the "chelating agent." Const. Decl. ¶ 39. Specifically, having failed to "correct" the examiner's interpretation that the Hospira aqueous formulation (containing norepinephrine bitartrate) had no chelating agent, Endo cannot now assert that norepinephrine bitartrate is, or disassociates in solution to form, a chelating agent. *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1096 (Fed. Cir. 2013) (applicants' failure to offer a differing interpretation limited invention to examiner's understanding); *Fuji Photo Film Co., Ltd. v. Int'l Trade Comm'n*, 386 F.3d 1095, 1100 (Fed. Cir. 2004) (examiner's interpretation applied where applicants failed to correct it).

Endo's reliance on *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011) is inapposite. First, the fact that Endo is relying upon case law outside of the pharmaceutical space here is telling. The precedent in the pharmaceutical space addressing this exact issue directly supports Baxter's construction and contradicts Endo's. *See, e.g.*, *Purdue*, 2015 WL 5032650, at *14 ("further comprising" claim language confirmed "zolpidem or a pharmaceutically acceptable salt thereof" and "a buffer" were separate components). Second, the patent specification in *Powell* described that "the cutting box . . . functions to contain the sawdust and wood chips generated as the blade cuts through the wood"—accordingly, the Court found that "the specification teaches that "the cutting box may also function as a dust collection structure . . . [and] does not suggest

18

that the claim terms require separate structures." *Powell*, 663 F.3d at 1230-33. The instant specification is in stark contrast to *Powell*. Here, as discussed above, the claim language, specification, and prosecution history each make it clear that "norepinephrine or a salt thereof" and "chelating agent" are separate chemical compounds. *See, e.g.*, *Becton*, 616 F.2d at 1254 ("The specification, moreover, confirms that the spring means is a separate element from the hinged arm, as the only elements disclosed in the specification as 'spring means' for urging the guard forward are separate structures from the hinged arm and its hinges.").

     **g.**     **Endo's Proposed Construction Is Nothing More Than a List of Examples, Ignores the Express Claim Language, and Improperly Refers to Examples in Lieu of Defining the Term.**

Endo dedicates less than a page in its Opening Brief, and only cites two passages in the common specification, to support its proposed construction. *Supra* at 5. This, in and of itself, establishes the lack of intrinsic support for Endo's proposed construction.

Endo's proposed construction consists of a list of examples of chelating agents listed in the specification rather than a finite definition. Merely reciting examples is not an acceptable way to construe a claim, Const. Decl. ¶ 41, particularly where doing so ignores overwhelming intrinsic evidence. *See, e.g.*, *Transcenic, Inc. v. Google Inc.*, 7 F. Supp. 3d 405, 412 (D. Del. 2013) ("Defendants contend that the specification consistently defines a database as containing data records, citing several examples. These examples are not definitions . . . ."); *Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings, Inc.*, No. 16-538, 2017 WL 4681328, at *6 (W.D. Pa. Oct. 18, 2017) (rejecting construction because "[t]he two close packed hexagonal structures mentioned in Plaintiff's construction are examples of the claim term, not its definition"); *In re Maxim Integrated Prods., Inc.*, MDL No. 2354, 2013 WL 6628762, at *34 (W.D. Pa. Oct. 9, 2013) ("[T]he listing of data objects, transaction scripts, and particular examples of each is merely a provision of examples of objects, not a definition . . . ."); *Oplus Techs., Ltd. v. Sears Holding*

*Corp.*, No. 12-5707, 2013 WL 11521845, at *5 (C.D. Cal. Jan. 14, 2013) ("Exemplars provide illustrations or examples for concepts.  Not definitions.")).

Notably, Endo criticizes Baxter's proposed constructions of "antioxidants" and "tonicity agent" / "tonicity adjusting agent" as allegedly "overly broad," and allowing inclusion of "agents that 'inhibit oxidation of another agent' [or 'increase[] osmolality of the composition'] only to some incidental, de minimis extent."  *Infra* at 35, 47.  However, Endo's concern magically disappears for "chelating agent" because Endo's theory is that the "bitartrate anion" of the claimed "norepinephrine bitartrate" salt "serv[es] as the claimed chelating agent."  *Supra* at 6-7.  And, Endo does not wish to be bound by a definition that would require this anion to actually chelate. In other words, through its proposed construction for "chelating agent," Endo approves of "de minimis" chelation that any "anion of the claimed 'norepinephrine or a salt thereof'" could provide.  Endo's inconsistent positions further exemplify the fatal flaws in its arguments.  Const. Decl. ¶ 53.

For at least these reasons, Endo's construction for "chelating agent" must be rejected.

### 3.     Endo's Reply Position

Although nearly half of Baxter's answering brief concerns the "chelating agent" term, (*see supra* at 7-20), the dispute boils down to a single issue: whether the chelating agent must be a "*separate* chemical compound" as Baxter proposes.  Baxter's narrow construction is a thinly veiled attempt to evade infringement by excluding the bitartrate anion—which its expert agrees is "formed when norepinephrine bitartrate is in solution"—from the scope of "chelating agent."  *See* Const. Decl. ¶ 43.  As discussed below, the evidence does not support Baxter's goal here.

Baxter's proposed construction is improper on its face because it requires a "*separate* chemical compound" without stating what the chelating agent must be separate *from*.  Buckton

2nd Decl. ¶ 31.  It could mean separate from norepinephrine, or separate from all other ingredients in the composition, or something else.  Buckton 2nd Decl. ¶ 32.

It is undisputed that Baxter's construction would include chelating agents like the citric acid recited in one example in the Specification, which was a separate chemical compound at the time of its addition into solution.  *See, e.g.*, '735 patent at 9:13-14.  Even if it were proper to import limitations from specific examples into the claims (it is not), the disclosure of that citric acid example still does not mean that all "chelating agents" must be separate chemical compounds at the time of their addition into solution.  Rather, the evidence supports that "chelating agents" include *both* those compounds that are separate at the time of addition into solution and those that become separate chemical compounds when in solution.  Buckton 2nd Decl. ¶¶ 37-38.

### a.   The claim language does not require that the chelating agent be a "separate chemical compound."

Adopting Baxter's construction would improperly import a "separate chemical compound" limitation into the claims without intrinsic support.  Buckton 2nd Decl. ¶¶ 35-36.  The asserted claims do not recite that the chelating agent must be a "separate chemical compound" and, as discussed above, Baxter's construction improperly fails to recite what the chelating agent must be separate *from*.

The *Purdue* case that Baxter cites, (*see supra* at 18), is distinguishable at least because its holding rested on the finding that the element that supposedly satisfied the disputed "buffer" limitation could not even "exist as a single chemical entity."  *Purdue Pharm. Products. L.P. v. Actavis Elizabeth LLC*, No. 12–5311 (JLL)(JAD), 2015 WL 5032650 at *13 (D.N.J. Aug. 25, 2015).  Here, as Baxter's expert admits, the bitartrate anion can, and indeed will, exist as a single

chemical entity in the claimed solution.[7]   Const. Decl. ¶ 43; Buckton 2nd Decl. ¶ 41.  Baxter's other arguments based on *Purdue*, such as that the phrase "further comprising" means that the "norepinephrine or a salt thereof" must be a "separate chemical compound" distinct from the "chelating agent," (*supra* at 12), are improper and premature attempts to argue noninfringement under the guise of claim construction.  *See SmithKline Beecham*, 403 F.3d at 1339-40.

Baxter also asserts—without support in the case law—that the "[r]eference to separate concentration ranges" for "norepinephrine or a salt thereof" and the "chelating agent" necessitates its "separate chemical compound" construction.  *Supra* at 13.  As discussed above, however, recitation of two separate ranges does not mean that "chelating agents" cannot include compounds that become "separate chemical compounds" by disassociating from norepinephrine in solution.  In the case of norepinephrine bitartrate, for example, a POSA would readily recognize that the claimed ranges of "norepinephrine or a salt thereof" and those of the "chelating agent," substantially overlap and reflect that the applicants clearly intended that the bitartrate anion— among others—be included in the scope of "chelating agent."  Buckton 2nd Decl. ¶¶ 45-50.

### b.    The Specification does not require that the chelating agent be a "separate chemical compound."

Baxter acknowledges that the Specification specifically identifies "tartrate" (i.e., bitartrate anion) as one of the claimed "chelating agents."  *See supra* at 15.  Yet, Baxter also argues that the term excludes the bitartrate anion, which is the chelating agent that is released when norepinephrine bitartrate is in solution.  Those positions are irreconcilable.[8]

---

[7] The *David Netzer* and *HTC* cases cited by Baxter are also easily distinguishable: the former concerned proper ordering of steps in a claimed process, while the latter concerned functional limitations.  *See David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 996 (Fed. Cir. 2016); *HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1275 (Fed. Cir. 2012).

[8] Baxter's suggestion that "'norepinephrine or a salt thereof' do[es] double duty as both the prior art drug and as the 'chelating agent'" is inaccurate.  *Supra* at 3.  As explained, in the case of norepinephrine bitartrate, only the bitartrate portion is the chelating agent.  Buckton 2nd Decl. ¶ 43.

In arguing that "the data in the patent establish that the bitartrate anion does not provide the necessary chelation," (*supra* at 15-16), Baxter cherry-picks language from the Specification. In so doing, Baxter ignores that the asserted claims recite several elements in addition to the presence of a chelating agent, including: pH, the active, a tonicity agent, respective concentrations of the components, that the composition is substantially free of antioxidants, particular isomers of norepinephrine, and particular storage conditions. Buckton 2nd Decl. ¶ 40. There is no statement in the intrinsic evidence about whether or not the bitartrate anion "provide[s] the necessary chelation," and a POSA would understand that such a statement would lack any meaning absent consideration of all of those other parameters and elements. Buckton 2nd Decl. ¶ 40. Moreover, the extent to which the bitartrate anion chelates metal ions in the claimed solution is beside the point: the claims simply require that a "chelating agent" be present in the recited concentration, but the claims do not recite a threshold level of functionality that the chelating agent itself must achieve in the composition. *See Novartis*, 2014 WL 4364674 at *2 (distinguishing between "presence claims" merely requiring that an antioxidant be present versus "function claims" that

---

Even if norepinephrine bitartrate (rather than norepinephrine) were considered the "norepinephrine or a salt thereof," the bitartrate anion would still meet the "chelating agent" claim limitation. *See, e.g.*, *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use of two terms in a claim requires that they connote different *meanings*, not that they necessarily refer to two different *structures*."); *Cannon Rubber Ltd. v. The First Years, Inc.*, 163 F. App'x 870, 876 (Fed. Cir. 2005) (rejecting argument that district court erred in construing claims such that a single structural component met two claim limitations); *Wasica Fin. GmbH v. Schrader Int'l, Inc.*, No. 13-1353-LPS, 2019 WL 1011321, *4 (D. Del. Mar. 4, 2019) ("[T]he same physical structure can satisfy multiple limitations."; "[T]his is not a situation in which satisfying multiple claim limitations with the same structure would render the claims 'nonsensical,' or where 'the specification plainly describes the two components as separate.'"); *see also Gibbs v. Triumph Trap Co.*, 26 F.2d 312, 314 (C.C.A. 2d Cir. 1928) (L. Hand, J.) ("When a patentee prescribes two elements in a claim he means that each will contribute its share of the result, but their duality is not important. When the two are incorporated into a single physical element, it remains as much a means to the first result and a means to the second, as though it were in two parts.").

required the antioxidant to affect a recited compound to a particular extent); *Hewlett-Packard*, 909

F.2d at 1468; Buckton 2nd Decl. ¶ 41.

Baxter also points to what it admits are "exemplary formulations" to support its flawed

construction. *Supra* at 14-15. Such reliance directly conflicts with Federal Circuit precedent,

which has "repeatedly cautioned against limiting the claimed invention to preferred embodiments

or specific examples in the specification." *Teleflex*, 299 F.3d at 1328.

### c.   The prosecution history does not require that the chelating agent be a "separate chemical compound."

The extent of Baxter's supposed support in the prosecution history is a statement by the

Examiner—not by the applicants—that the Hospira prior art reference does not contain a chelating

agent. *Supra* at 16-17. The case law, however, does not require that an applicant "fight tooth and

nail every possibly adverse thought an examiner commits to paper, nor . . . advance redundant

arguments for patentability"; rather, an applicant need only make the points necessary to obtain

allowance of the proposed claims. *TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1330

(Fed. Cir. 2003). Moreover, the sentence from the applicant's response that Baxter cites discusses

additional elements, such as the use of particular concentration ranges of norepinephrine and the

chelating agent, and also recites a particular pH range. *Supra* at 18. The applicant's argument was

that there was "unexpectedly and significantly increased" stability of norepinephrine when all of

those elements were met, and allowance of the claims followed shortly thereafter. There was thus

no need to rebut the Examiner's incorrect statement about chelating agents in the Hospira

reference. *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1373-74 (Fed.

Cir. 2003) ("Prosecution history cannot be used to limit the scope of a claim unless the applicant

took a position before the PTO. An applicant's silence in response to an examiner's

characterization of a claim does not reflect the applicant's clear and unmistakable acquiescence to

24

that characterization if the claim is eventually allowed on grounds unrelated to the examiner's unrebutted characterization." (cleaned up)).

Moreover, the *Biogen* and *Fuji* cases Baxter cites are readily distinguishable.  *Biogen* concerned an Examiner's rejection for lack of enablement—and therefore concerned the Examiner's interpretation of the applicant's own words—not a rejection based on the Examiner's view of the prior art.  *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1096 (Fed. Cir. 2013).  *Fuji* concerned a rejection for lack of antecedent basis, which also relates to the Examiner's interpretation of the applicant's own language.  *Fuji Photo Film Co. v. ITC*, 386 F.3d 1095, 1100 (Fed. Cir. 2004).  Here, in contrast, the rejection that Baxter seeks to rely on has nothing to do with interpreting anything that the applicant wrote.  What is more, patent examiners are not POSAs.  Baxter's exclusive reliance on Examiner statements as supporting evidence from the prosecution history is, in fact, no support at all.

### d.    Endo's proposed construction should be adopted.

Endo's proposed construction should be adopted because it comes directly from the Specification and aligns with a POSA's understanding of what "chelating agents" are.[9] *InterDigital*, 690 F.3d at 1324; *Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1371 (Fed.

---

[9] Baxter accuses Endo of taking "inconsistent positions" as between its proposed construction of "chelating agent" and those of "antioxidants" and "tonicity agent."  *Supra* at 20.  But, in fact, there is a common, consistent idea behind all three of Endo's proposed constructions:  that it is improper to create functional limitations where none exist in the intrinsic evidence.  For example, Baxter's constructions of "antioxidants" and "tonicity agent" are framed in purely functional terms, rather than on what a POSA would have understood "antioxidants" and "tonicity agent" to actually mean.  As a result of Baxter's improper construction, it unduly broadens the scope of those terms to include anything that even minimally inhibits oxidation or increases osmolality, respectively, even if a POSA would have been unaware of such functionality.  Buckton 2nd Decl. ¶¶ 12, 26.  Conversely, Endo's constructions of those terms, as well as its construction of "chelating agent," properly derive meaning from the perspective of the knowledge of a POSA, including what a POSA would have "commonly understood" to be compounds that are within the scope of the respective terms.  Buckton 2nd Decl. ¶¶ 7, 25, 44.

Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification, of which they are a part."). Although Baxter cites a variety of cases to argue that Endo's construction "is not an acceptable way to construe" the term, each of those cases is inapposite because they concern situations where a party sought to restrict a term to what was described in the specification. *See supra* at 19-20. Baxter also asserts that Endo's construction is simply "a list of examples of chelating agents," but that argument ignores the fact that Endo's construction begins by reciting entire classes of chelating agents—various bicarboxylic acids, tricarboxylic acids, and aminopolycarboxylic acids—and then lists some exemplary species within those classes of "chelating agents."

### 4. Baxter's Sur-Reply Position

#### a. Endo Has No Answer to Baxter's Federal Circuit Precedent Regarding the Express Claim Language.

Endo fails to distinguish Baxter's Federal Circuit precedent—which supports Baxter's proposed construction requiring that the "chelating agent" be a "separate chemical compound, added to the composition." *See supra* at 9-11. Instead, Endo incorrectly argues that "[a]dopting Baxter's construction would improperly import a "separate chemical compound" limitation into the claims *without intrinsic support*," and solely cites its own expert. *Supra* at 21 (emphasis added). It is telling that Endo could not find a single case to support its argument. In contrast, Baxter cites four Federal Circuit cases and—among other intrinsic support—the claim language itself, which courts recognize as the most important "intrinsic support" for claim construction. *See Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). The claim language is crystal clear:   "a chelating agent" is listed as a component separate from "norepinephrine or a salt thereof." "Where a claim lists elements separately, 'the clear implication

of the claim language is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010).

Endo's attempt to distinguish another of Baxter's cases, *Purdue*, fails.[10]  Endo cherry-picks language from *Purdue*'s infringement analysis; this does not discount the Court's findings with respect to interpreting claims containing the phrase "further comprising."  *Purdue Pharm. Prods. L.P. v. Actavis Elizabeth LLC*, No. 12-5311, 2015 WL 5032650, at *14 (D.N.J. Aug. 25, 2015) ("The phrase 'further comprising' signals that these claimed elements … are distinct components of the solid pharmaceutical composition.").

Endo next manufactures a new argument that Baxter's construction is ambiguous because "Baxter's construction improperly fails to recite what the chelating agent must be separate *from*." *Supra* at 21.   Belying this argument is Endo's clear understanding of Baxter's proposed construction set forth in its opening salvo: "under Baxter's construction, the anion of the claimed 'norepinephrine or a salt thereof' could not serve as the claimed 'chelating agent' because it is not a 'separate chemical compound' from the norepinephrine salt."  *Supra* at 6.  As evidenced by Endo's previous understanding, Baxter's construction was—and still is—clear:  a "chelating agent" must be "a separate chemical compound, added to the composition."  No additional specificity is needed, as Baxter's construction—consistent with Federal Circuit precedent— requires the "chelating agent" to be separate from the other separately-listed ingredients in the claim.  This understanding is fully supported by the specification.  *See Supra* at 13-16.  For example, EDTA and citric acid, which were added to the formulations in the common

---

[10] Endo also blatantly misstates paragraph 43 of Dr. Constantinides' declaration.  In no way did Dr. Constantinides "agree[]" that "the bitartrate anion" is "formed when norepinephrine is in solution."  *Supra* at 21-22.  Rather, he stated: "I understand that ***Endo asserts*** that the bitartrate anion or tartaric acid ***may form*** when norepinephrine is in solution."  1st Const. Decl. ¶ 43 (emphasis added).  Dr. Constantinides rebuts ***Endo's*** assertion.  *Id.*; 2nd Const. Decl. ¶¶ 11-13.

specification's Examples, are clearly separate from "norepinephrine or a salt thereof" and the tonicity agent, sodium chloride.  '735 patent at 9:13, Tables 4, 6, 11.

Endo also feebly avers that "the asserted claims do not recite that the chelating agent must be a 'separate chemical compound.'"  *Supra* at 21.  Yet, Endo cites no case law requiring such an explicit recitation.  Baxter's Federal Circuit cases confirm that listing separate components in the claims is enough.  *See supra* at 10-11.  Endo does not even attempt to rebut the fact that a number of the claims require "combining" and "admixing" the separately-listed components, an impossibility if they were the same.  *See supra* at 11-12.[11]

Contrary to Endo's assertion, Baxter's construction and arguments in support of the same are not "improper and premature attempts to argue noninfringement under the guise of claim construction."  *Supra* at 22 (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1339-40 (Fed. Cir. 2005).  It is perfectly acceptable to provide the Court context to understand the dispute on claim construction.  *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326 (Fed. Cir. 2006) ("the legal function of giving meaning to claim terms always takes place in the context of a specific accused infringing device or process").

Endo also states that "the evidence supports that 'chelating agents' include *both* those compounds that are separate at the time of addition into solution *and* those that become separate chemical compounds when in solution."  *Supra* at 21.  Rather than citing any ***intrinsic evidence***, Endo cites its own expert's declaration.  Tellingly, Dr. Buckton also fails to cite any intrinsic evidence in the cited paragraphs.  *Id.*; 2nd Buckton Decl. ¶¶ 37-38. As Baxter has previously noted, the specification makes it clear that "chelating agents" are added to the formulations, *supra* at 13-

---

[11] Endo also criticizes Baxter's proposed construction as "narrow," *supra* at 20, when in fact, it is broader than Endo's since it does not limit the "chelating agent" to mere examples.

16, which is consistent with Endo's identification of citric acid as the "chelating agent" in the norepinephrine bitartrate formulations of Table 4, and its failure to identify the bitartrate anion as a "chelating agent." '735 patent at Table 4; Birkos Decl. Ex. 1 at 7.  The reason is simple—citric acid was added to the formulation and the "bitartrate anion" was not.

Endo next relies on its expert's opinion to declare that "a POSA would readily recognize that the claimed ranges of 'norepinephrine or a salt thereof' and those of the 'chelating agent,' substantially overlap and reflect that the applicants clearly intended that the bitartrate anion— among others—be included in the scope of 'chelating agent.'" *Supra* at 22.  However, Endo's expert's opinion assumes—without data—complete dissociation of the bitartrate salt.  2nd Const. Decl. ¶ 18.  Further, any purported clear intention to include the bitartrate anion within the scope of "chelating agent" is flatly contradicted by the totality of the intrinsic evidence.  *Id.* ¶¶ 19-20.

### b.    Endo's Arguments Regarding Baxter's Specification Evidence Fail.

Baxter maintains that Endo's infringement theory requires the claimed "norepinephrine or a salt thereof" to do "double duty as both the prior art drug and as the 'chelating agent.'" *Supra* at 3.  Endo's arguments to the contrary fail because they contradict Endo's own specification.  *Supra* at 22-23 n.8.  There are no examples in the specification where norepinephrine bitartrate is shown to be, or described as, "self-chelating."  Rather, all the examples in the common specification use a separate chelating agent from the norepinephrine bitartrate active agent—formulations I-IX use citric acid, and formulations X-XVIII use EDTA.

FDA first approved norepinephrine bitartrate in the 1950s.  2nd Const. Decl. ¶ 17. Norepinephrine bitartrate is the only norepinephrine active ingredient that has ever been used in FDA-approved parenteral drug products.  *Id.*  It is also the only norepinephrine active agent used in all 18 examples in the specification.  '735 patent at Tables 4, 6, 11.  Despite norepinephrine

bitartrate being used for over 70 years, and being used by Endo in its experiments, neither Endo nor its expert point to a single piece of evidence that norepinephrine bitartrate is self-chelating.

Endo's cited cases purporting to assert that one component can satisfy more than one claim element are inapposite. *Supra* at 22-23 n.8. Indeed, as one of Endo's cited cases states, "[t]he prosecution history, specification, comparison with other claims in the patent, and other evidence may require that two terms in a claim refer to different structures." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006). Baxter's proposed construction checks all of these boxes, as the entire intrinsic record, including the express claim language itself, "require[s] that two terms in a claim refer to different structures." *Id.*

Endo criticizes Baxter's argument regarding the lack of data establishing the necessary chelation of any bitartrate anion, and argues that "the claims simply require that a 'chelating agent' be present in the recited concentration, … [without] recit[ing] a threshold level of functionality that the chelating agent itself must achieve in the composition."[12] *Supra* at 23. Endo's argument overlooks Baxter's full proposed construction, which requires "a separate chemical compound, added to the composition, ***with at least two donor groups that form a ring structure with a metal ion***." Baxter maintains that the data in the patent fail to demonstrate that any purported bitartrate anion "forms a ring structure with a metal ion."

Endo criticizes Baxter's "reliance" on "exemplary formulations" and cites (and more importantly, misquotes) *Teleflex* for its statement that the Federal Circuit has "cautioned against

---

[12] Notably, Endo welcomes "de minimus" chelation, but shuns the same with respect to tonicity agents and antioxidants. *Supra* at 23, 25 n.9; *infra* at 40. In an attempt to argue away its glaringly-inconsistent positions, Endo criticizes Baxter's use of functional language in its constructions and baldly declares that "it is improper to create functional limitations where none exists in the intrinsic evidence" without citing any case law support. *Supra* at 25 n.9. However, Endo's own expert embraces such functional language. 1st Buckton Decl. ¶¶ 33-34, 40; *Supra* at 9; *infra* at 36-37, 39, 52.

limiting the claimed invention to preferred embodiments or specific examples in the specification." *Supra* at 24.  Yet, the entirety of Endo's construction is a list of examples (the construction even starts with "includes various…").   Endo attempts to salvage its improper example-listing construction by arguing that its "construction begins by reciting entire classes of chelating agents." *Supra* at 26.  Entire classes of chelating agents are still entirely examples—not a definition.  Unlike Endo, Baxter defines what a "chelating agent" is, and does not limit the "claimed invention" to "preferred embodiments or specific examples."  *See Bracco Diagnostics Inc. v. Maia Pharms., Inc.*, 839 F. App'x 479, 486 (Fed. Cir. 2020) ("Listing numerous compounds that meet the language of a functional term in a claim confuses construing what the function is with what compounds perform that function.  The latter is not the task of claim construction, which is to provide definitional meaning to claim language.").

### c.   Endo's Arguments Regarding Baxter's Prosecution History Evidence Fail.

Rather than supply any of its own evidence from the prosecution history to support its proposed construction, Endo continues its assault on Baxter's actual evidence by characterizing the Examiner's statement about chelating agents in the Hospira reference as "incorrect."  *Supra* at 24.  If the Examiner's recognition that Levophed® does not contain a "chelating agent" is "incorrect," *id.*, this begs the question whether Endo was similarly "incorrect" when it failed to identify the bitartrate anion of norepinephrine in Table 4 as a chelating agent, *see supra* at 14-15.

### B.   "antioxidants"

### 1.   Endo's Opening Position

The term "antioxidants" is recited in claim 1 of the '657 patent, claims 1 and 13 of the '436 patent, claims 1 and 14 of the '735 patent, claim 1 of the '026 patent, claim 1 of the '850 patent, and claim 1 of the '458 patent.

The parties have proposed the following constructions:[13]

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "excipients whose function is commonly understood by a person of ordinary skill in the art to be antioxidants, as listed in the Handbook of Pharmaceutical Excipients (7th ed.)" | "agents that inhibit oxidation of another agent" |

### a.   Endo's proposed construction reflects how a POSA would understand the term in light of the intrinsic evidence and knowledge in the art.

Endo's construction should be adopted because it is consistent with how a POSA would ordinarily understand the term "antioxidants," and because nothing in the intrinsic evidence suggests that the term should carry any different meaning. *See InterDigital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) ("The plain meaning of claim language ordinarily controls unless the patentee acts as his own lexicographer and provides a special definition for a particular claim term or the patentee disavows the ordinary scope of a claim term either in the specification or during prosecution."); Declaration of Dr. Graham Buckton ("Buckton Decl.") ¶¶ 25-33.

The Specification supports Endo's proposed construction. For example, the Specification provides several examples of antioxidants—such as sodium metabisulfite, butylated hydroxyl anisole, and ascorbic acid—each of which a POSA would have understood to function as an antioxidant in light of knowledge in the art and each of which is identified as an antioxidant in the Handbook. *See, e.g.*, '735 patent at 2:15-16, 3:26-32, 7:31-33. Thus, the Specification reinforces that the patentees intended for "antioxidants" to refer to compounds commonly understood to be antioxidants, and neither created a special definition of the term nor disavowed any of its ordinary

---

[13] Baxter further asserts that claims containing this term are indefinite. *See* Baxter's Initial Invalidity Contentions, dated March 18, 2022.

scope.

A POSA would recognize that the intrinsic evidence does not provide any special definition to the term "antioxidants" that differs from how that term would typically be understood in the art. Buckton Decl. ¶¶ 31-32. Accordingly, the proper construction of the term should reflect its plain meaning as it would have been understood by a POSA. *See InterDigital*, 690 F.3d at 1324. That is precisely what Endo's construction does, through the use of the Handbook of Pharmaceutical Excipients ("Handbook"), an authoritative text in the field.[14]   *See Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1322) (courts may rely on dictionaries, which are "often useful to assist in understanding the commonly understood meaning of words").

POSAs as of the January 30, 2017 priority date regularly consulted (and, to this day, still regularly consult) the Handbook of Pharmaceutical Excipients ("Handbook") when developing pharmaceutical formulations.[15]   Buckton Decl. ¶ 29. The Handbook is authoritative and well-respected, and even FDA uses the Handbook when analyzing excipients in drug products. Buckton Decl. ¶ 27; FDA, Quality by Design for ANDAs: An Example for Immediate-Release Dosage Forms (April 2012), https://www.fda.gov/files/drugs/published/quality-by-design-%28QbD%29-for-an-immediate-release.pdf at 34-35, 44 (citing Handbook for recommended ranges and levels of excipients). The Handbook contains information from the four main pharmacopeia (British, Japanese, European, and United States)—each of which provides standards for quality, purity, and other characteristics of pharmaceuticals and their ingredients—and is the primary resource a POSA

---

[14] Dr. Buckton, who is providing a declaration in support of this brief, recently retired from the steering committee of the Handbook. *See* Buckton Decl. ¶ 3.

[15] As of the January 30, 2017 priority date, the seventh edition of the Handbook was the most current. Buckton Decl. ¶ 26.

consults about the properties and functions of excipients.  Buckton Decl. ¶ 27; USP, "What is a Pharmacopeia?" (Aug. 7, 2014), https://qualitymatters.usp.org/what-pharmacopeia.  As further proof of its authoritative and well-respected status, a search of Google Patents for "Handbook of Pharmaceutical Excipients" returns more than 7,000 results that cite to the Handbook as relevant art, and a search in Google Scholar for the same term in scientific publications returns over 12,000 results.  Buckton Decl. ¶ 28.  The Handbook is also used in teaching courses relating to pharmaceutical formulation, and remains a standard lab bench reference in the industry.  Buckton Decl. ¶¶ 27, 29.  Given that widespread use in the field, the Handbook is a codification of the understanding of a POSA.  *See*, *e.g.*, *Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1290-91 (Fed. Cir. 2008) (after finding that the intrinsic evidence provided no special definition of disputed terms, consulting a technical dictionary to determine "the ordinary meaning of the terms . . . as understood by a person of ordinary skill in the art at the time of the invention"); Buckton Decl. ¶ 26.

The entry for each excipient in the Handbook contains a section titled "Functional Category" that recites the functions each excipient is understood to have.  Buckton Decl. ¶ 30.  If a given function is not described within the entry for an excipient, a POSA would know that the excipient is not commonly understood to have that function.

> b.  **Baxter's proposed construction is unsupported by the intrinsic evidence and expands the scope of the term far broader than what a POSA would understand it to be.**

Baxter's proposed construction should be rejected as overly broad and inconsistent with the understanding of a POSA.  Under Baxter's construction, even those agents that were not commonly known to be antioxidants would fall within the scope of the term.  Similarly, Baxter's construction would improperly include agents that "inhibit oxidation of another agent" only to some incidental, de minimis extent.  The inclusion of such agents has no support in the intrinsic

evidence, and a POSA would not consider an agent that only trivially inhibits oxidation of another agent to be within the ordinary meaning of the term "antioxidant." *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning. We indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning."); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); Buckton Decl. ¶ 33.

### 2.      Baxter's Answering Position

Baxter proposes that the Court construe "antioxidants" in accordance with the ordinary and customary meaning of that term as confirmed by the intrinsic evidence.  Endo's construction, based solely on extrinsic evidence, should be rejected.

### a.      <u>Background.</u>

The term "antioxidants" appears in the asserted claims as part of the phrase "substantially free of ***antioxidants***."  *See, e.g.*, '657 patent at claim 1; '436 patent at claims 1, 13; '735 patent at claims 1, 14; '026 patent at claim 1; '850 patent at claim 1; '458 patent at claim 1.  While the parties agree that the common specification defines "substantially free" in the context of the term "substantially free of antioxidants," D.I. 46, Joint Claim Construction Chart at A21,[16] the parties proposed the following constructions for "antioxidants":

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "excipients whose function is commonly understood by a person of ordinary skill in the art to be antioxidants, as listed in the Handbook of Pharmaceutical Excipients (7th ed.)" | "agents that inhibit oxidation of another agent" |

---

[16] Baxter maintains that the term "substantially free of antioxidants," even under the express definition provided by the Patents-in-Suit, renders all of the asserted claims are indefinite.

### b.    Baxter's Proposed Construction Applies the Ordinary and Customary Meaning of "Antioxidants."

Baxter proposes that the Court construe the term "antioxidants" according to its ordinary and customary meaning as "agents that inhibit oxidation of another agent." Const. Decl. ¶¶ 54-58. The word "[a]ntioxidant" refers to "[a]n agent which inhibits oxidation and thus is used to prevent the deterioration of preparations by the oxidative process."  Ansel 1995 at 112.  "Antioxidants are materials added to a product to prevent oxidation of the active ingredient(s)."  Groves 1985 at 24; *see also* Handbook of Pharmaceutical Additives 2002 at 1044 (noting that an "antioxidant is "[a] substance that retards oxidation, deterioration, rancidity, and gum formation in organic substances.").

Endo's expert Dr. Buckton applies this ordinary and customary meaning when he explains that "[a]n antioxidant is an excipient which is both safe and effective in limiting oxidation of an active in a formulation, and in this case one which is suitable for administration into the bloodstream."  Buckton Decl. ¶ 33.  Because Baxter's proposed construction, "agents that inhibit oxidation of another agent," reflects the undisputed common understanding of "antioxidants," it should be adopted.  *Phillips*, 415 F.3d at 1312-13 ("[W]ords of a claim are generally given their ordinary and customary meaning.").

### c.    Baxter's Proposed Construction Is Consistent with Intrinsic Evidence.

This common understanding is also consistent with the use of the term "antioxidants" in the intrinsic evidence.  For example, the specification identifies "sodium metabisulphite as an antioxidant" in Levophed®, a concentrated injectable norepinephrine bitartrate formulation that is diluted prior to intravenous infusion.  '735 patent at 2:1-5.  The specification then presents stability data for diluted Levophed® and states:

> ***Stability*** of Levophed® and Norepinephrine bitartrate injection (Baxter), in normal saline solutions is presented in Table 2 and Table

3 where norepinephrine was diluted to a concentration of 16 μg/ml. ***Stability*** was assessed in 250 ml saline at accelerated (i.e., 40±2° C. and 75±5% relative humidity, duration as indicated) and long term ***stability*** (i.e., 25±2° C. and 60±5% relative humidity, duration as indicated) storage conditions. . . .

As can be seen from the results, ***the norepinephrine*** at ready-to-inject concentrations ***underwent significant degradation***. ***Oxidative degradation could possibly be reduced or even prevented by addition of effective amounts of sodium metabisulphite*** to the ready-to-inject norepinephrine solution.

*Id.* at 2:37 – 3:21 (emphasis added).  In this passage, sodium metabisulphite is clearly functioning as an "agent[] that inhibit[s] oxidation" (i.e., "[o]xidative degradation") "of another agent" (i.e., the norepinephrine bitartrate).

Similarly, Endo's characterization of "an antioxidant" in the prosecution history as "agents to stabilize the API" is consistent with Baxter's proposed construction:

the teachings of LEVOPHED and Surakitbanharn are drawn to the concentrated forms with either ***an antioxidant*** and/or a cyclodextrin ***as agents to stabilize the API (pharmaceutically active ingredient)***. It was also well known at the time of filing the instant application that once diluted, norepinephrine solutions should be discarded within one day after reconstitution when stored at room temperature.

'735 patent PH, 4/2/2019 Response at 6-7 (emphasis added).  Again, antioxidants are described in the common specification as agents used to stabilize the API by "reduc[ing]" or "prevent[ing]" "[o]xidative degradation").  Endo's statements in the prosecution history thus also align with Baxter's proposed construction: "agents" "that inhibit oxidation" (i.e., "stabilize" or "reduce[]" / "prevent" "[o]xidative degradation") "of another agent" (i.e., "the API").

### d.    <u>Par's Prior Art Patent Also Supports Baxter's Proposed Construction.</u>

Baxter's proposed construction also comports with a definition offered by Endo in a prior art patent directed to injectable epinephrine formulations: "The present invention provides for a composition that may comprise at least one antioxidant.  ***The term 'antioxidant' refers to a***

**component in a composition that may prevent and/or inhibit the formation of unacceptable amounts of oxidative degradants in the composition** after a certain period of shelf life." U.S. Patent No. 9,119,876 at 5:14-25 (emphasis added); *see also* Complaint at 1-3, *Par Pharm., Inc. v. Hospira, Inc.*, No. 17-cv-00944 (D. Del. July 13, 2017) (identifying Par Sterile Products, LLC as a Plaintiff that "own[s] and ha[s] exclusive rights to the '876 patent"). Again, this confirms that Baxter's proposed construction is consistent with the ordinary and customary meaning of the term. Const. Decl. ¶¶ 59-60; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584-85 (Fed. Cir. 1996) (recognizing prior art as "objective and reliable guide[]" for claim construction).

> e.     **Endo's Proposed Construction Is Unsupported by the Intrinsic Evidence and Improperly Incorporates Extrinsic Evidence.**

Rather than defining the term "antioxidants," Endo would have the skilled artisan consult the HPE and review the "Functional Category" section of the numerous excipient entries in order to determine what "antioxidants" means. Again, as noted for "tonicity agent" / "tonicity adjusting agent" below, this approach is absurd. *See Eli Lilly*, 2008 WL 2410420, at *3.

Here, the common specification does not direct the reader to consult the HPE to determine what antioxidants are; rather, the shared specification explains that the antioxidant, sodium metabisulphite, is used to reduce or prevent oxidative degradation of norepinephrine bitartrate. *See, e.g.*, '735 patent at 2:37 – 3:21; Const. Decl. ¶ 57. Again, in so stating, the specification confirms that antioxidants are "agents that inhibit oxidation of another agent."

For the same reasons discussed below for the terms "tonicity agent" and "tonicity adjusting agents," Endo's reliance on *Free Motion Fitness* is misplaced. Again, the HPE does not provide a "dictionary definition[]" for antioxidants. *Free Motion Fitness*, 423 F.3d at 1348. As Endo's own expert confirms, "[a]n antioxidant is an excipient which is both safe and effective in limiting oxidation of an active in a formulation." Buckton Decl. ¶ 33. In other words, Endo eschews the

ordinary and customary meaning clearly supported by the intrinsic evidence, and improperly incorporates a 1,000+ page treatise into its so-called "definition." *Phillips*, 415 F.3d at 1317.

Even assuming *arguendo* that incorporating the HPE into a construction is proper (it is not), reference to "excipients whose function is commonly understood by a person of ordinary skill in the art to be antioxidants" and reliance on the HPE in no way "assign[s] a fixed, unambiguous, legally operative meaning to the claim[s]." *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004). For example, in the HPE entry for Citric Acid Monohydrate, this excipient is identified as an "antioxidant" in the "Functional Category" section and is further described as an "antioxidant synergist" in the "Applications in Pharmaceutical Formulation or Technology" section. HPE 2012 at 194. The HPE entries for Edetic Acid and Tartaric Acid, on the other hand, describe each of these excipients in the "Applications in Pharmaceutical Formulation or Technology" section as "antioxidant synergist"; however, the "Functional Category" sections identify these excipients as "Antimicrobial preservative; complexing agent" for Edetic Acid and "Acidulant; complexing agent; flavoring agent" for Tartaric Acid. *Id.* at 281, 840. Thus, it is unclear whether edetic acid or tartaric acid would be considered "antioxidants, as listed in the Handbook of Pharmaceutical Excipients (7th ed.)" in accordance with Endo's proposed construction. Const. Decl. ¶ 61.

Further, the HPE is not exhaustive as to the list of excipients that a skilled artisan would consider to function as an antioxidant in a particular formulation. For example, reducing sugars may function as an antioxidant in a particular formulation even if they are not listed as an antioxidant in the HPE. Const. Decl. ¶ 64.

Endo's proposed construction is also improper because it includes the very term in question ("antioxidants") in its construction. Again, courts disfavor such circular constructions. *See, e.g.*,

39

*ACTV*, 346 F.3d at 1090; *Harris*, 114 F.3d at 1152; *Lecat's Ventriloscope*, 283 F. Supp. 3d at 712;

*Univ. of Fla. Rsch. Found.*, 3 F. Supp. 3d at 1377.  For at least these reasons, Endo's proposed

construction for "antioxidants" should be rejected.

### 3.   Endo's Reply Position

Baxter's proposed construction of "antioxidants" is overly broad.  Baxter's construction

would include any excipient that inhibits oxidation of "another agent"—whether "another agent"

is an active agent or just another excipient.  Baxter's construction would also sweep in excipients

that only trivially inhibit oxidation.[17]  Thus, as previously discussed, Baxter's proposed

construction is inconsistent with a POSA's understanding of the Specification.  *See supra* at 34-

35.

Baxter's cited intrinsic evidence, which all relates to the use of sodium metabisulphite, is

not persuasive given that sodium metabisulphite was commonly understood by POSAs to be an

antioxidant (and therefore is also an "antioxidant" under Endo's construction).  Buckton 2nd Decl.

¶¶ 19-21.

Baxter's cited extrinsic evidence goes further and shows why its construction is actually

incorrect.  For example, the Groves 1985 reference states that antioxidants "prevent oxidation of

*the active ingredient(s)*"—not of simply any other agent present.  *Supra* at 36 (emphasis added).

Baxter concedes as much when it quotes Endo's expert, Dr. Buckton, who describes "limiting

oxidation of *an active* in a formulation."  *Id*. (quoting Buckton 1st Decl. ¶ 33) (emphasis added);

---

[17] Baxter's noninfringement strategy based on this construction is apparent:  to argue that multiple excipients and impurities, none of which are commonly understood to be antioxidants, are nonetheless "agents that inhibit oxidation of another agent" such that Baxter's product would not satisfy the "substantially free of antioxidants" limitation in the claims.  That, of course, is inconsistent with how both POSAs and the applicants would have understood this term.  *See Novartis Pharm. Corp. v. Par Pharm., Inc.*, No. 11-1077-RGA, 2014 WL 4364674, *6-7, *6 n.9 (D. Del. Aug. 29, 2014).

*see also* Buckton 2nd Decl. ¶¶ 9, 11.  For at least this reason, Baxter's construction does not apply

"the ordinary and customary meaning" as it purports to do, (*supra* at 36), and should be rejected.[18]

Determining the proper construction of "antioxidants" is straightforward.  It is undisputed

that there is no special meaning or disavowal of scope of this term in the intrinsic evidence.

Accordingly, the plain meaning must control.  *See InterDigital Commc'ns, LLC v. ITC*, 690 F.3d

1318, 1324 (Fed. Cir. 2012).   And the plain meaning necessarily refers to excipients whose

function is commonly understood by POSAs to be antioxidants.  Buckton 2nd Decl. ¶ 7.  To

identify those excipients, a POSA would look to the Handbook.  Buckton 2nd Decl. ¶¶ 13-15, 17.

### a.   Endo's proposed construction properly focuses on how POSAs commonly understood the term.

In attacking Endo's citation to the Handbook, (*supra* at 38-40), Baxter disregards the real

focus of Endo's proposed construction, which is that "antioxidants" must be construed based on

how that term would be "commonly understood" by POSAs.[19]   *InterDigital*, 690 F.3d at 1324;

Buckton 2nd Decl. ¶ 7.

Baxter is simply incorrect that Endo's construction would "incorporate" the entirety of the

Handbook.  *Supra* at 38-39.  By making that argument, Baxter ignores most of the language in

Endo's proposed construction and essentially rewrites it to read: "excipients whose function is

~~commonly understood by a person of ordinary skill in the art to be antioxidants, as~~ listed in the

---

[18] Endo reserves the right to respond to any argument made by Baxter that the larger term "substantially free of antioxidants" is indefinite.  *See supra* at 35 n.16.

[19] Baxter's argument that the Handbook should not be considered because the Specification "does not direct the reader to consult" it, (*supra* at 38), is counter to the case law.  *See, e.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) (prior art, "whether or not cited in the specification or the file history," can be admitted to "help to demonstrate how a disputed term is used by those skilled in the art"); *Am. Radio LLC v. Qualcomm Inc.*, 578 F. App'x 975, 980 (Fed. Cir. 2014) (prior art not cited in intrinsic evidence "is nonetheless relevant to determining how [a claim term] would be read by those skilled in the art").

Handbook of Pharmaceutical Excipients (7th ed.)." That is both a straw man and far too restrictive a reading.[20]

### b. The Handbook is a useful authority for understanding the plain meaning of "antioxidants."

There is no dispute that the Handbook does not contain an entry for every possible excipient. Buckton 2nd Decl. ¶ 14. Rather, the Handbook is an exemplary reference that reflects the common understanding of the uses of excipients to a POSA—which sheds light on the meaning of "antioxidants" intended by the applicants here.[21]  Buckton 2nd Decl. ¶ 15. Nor can there be any dispute about the credibility and authority of the Handbook; as discussed, the Handbook has been cited thousands of times both in scientific publications and in the patent context. *See supra* at 34; Buckton 1st Decl. ¶ 28.

In an apparent attempt to undermine the credibility and authority of the Handbook, Baxter and its expert suggest that certain "reducing sugars" could be antioxidants, despite not being listed as such in the Handbook, because they "exhibit[ed] antioxidant activity" when incorporated into a "fish oil-in-water emulsion." Const. Decl. ¶ 64; *supra* at 39. But by noting that reducing sugars "may function as an antioxidant *in a particular formulation*," (*supra* at 39 (emphasis added)), Baxter highlights the flaw in its own construction and provides further support for Endo's: a POSA

---

[20] Baxter's argument about whether edetic acid and tartaric acid are "antioxidants," (*see supra* at 39), is based on its improper rewriting of Endo's construction and is a non sequitur—Endo has not taken any position about whether those two compounds are "antioxidants."

[21] Baxter's own expert has repeatedly relied on the Handbook in his patents and publications. *See, e.g.*, U.S. Patent No. 10,307,441 at 8:55-57 ("Other exemplary excipients are described in *Handbook of Pharmaceutical Excipients*, 6th Edition . . . ."); U.S. Patent No. 10,463,689 at 8:44-46 (same); WO2011047161A1 (same); AU2010306755B2 (same); CA2777066C (same); EP2488035 (same); JP5758904B2 (same); CN107260756 (same); CN102686111A (same); ES2633618T3 (same); JP6125567B2 (same); JP2017141275A (same); U.S. Patent Nos. 11,179,402 and 11,179,403 (citing the 5th and 6th editions of the Handbook); Constantinides et al., "Considerations and Recommendations on Traditional and Non-Traditional Uses of Excipients in Oral Drug Products," 2:3 AAPS Open (2016) at 5 (citing the Handbook as listing the "traditional" (i.e., commonly understood) uses of excipients).

would not consider excipients, such as reducing sugars, that have antioxidant activity in only particular, limited circumstances (e.g. in "the aqueous phase of a model fish oil-in-water emulsion") to fall within the term's plain meaning of "antioxidants."  Buckton 2nd Decl. ¶ 18. And that plain meaning controls because there is no evidence the applicants had an "express intent to impart a novel meaning" to this term.  *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

### c.  Baxter's tangential attacks on Endo's construction are contrary to the law and facts.

Baxter points out an unrelated Par patent that Baxter believes should provide a definition of "antioxidants" that should apply to the asserted claims here.  *Supra* at 37-38.  As the case law instructs, however, a definition in a completely unrelated patent is not competent evidence of how a term should be construed.  *See Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1104-05 (Fed. Cir. 2002); *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1369-70 (Fed. Cir. 2016); *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003).

Endo's construction properly defines the universe of excipients that are "antioxidants" within the scope of the asserted claims, based on the intrinsic evidence and the understanding of a POSA as reflected in the Handbook.  Nevertheless, Baxter suggests that Endo's proposed construction is somehow improper and "circular" merely because the disputed term ("antioxidant") appears within it.  There is no support in the case law for such proposition, however, and the facts of the cases cited by Baxter are readily distinguishable.  In those cases, the proposed constructions were rejected for reasons not at all applicable here, such as two disputed terms being used to define each other, or a contradiction/inconsistency with the plain meaning of the term without intrinsic support.  *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1090 (Fed. Cir. 2003); *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997); *Lecat's Ventriloscope v. MT Tool & Mfg.*,

283 F. Supp. 3d 702, 712 (N.D. Ill. 2008); *Univ. of Fla. Rsch. Found. v. Motorola Mobility LLC*, 3 F. Supp. 3d 1374, 1377 (S.D. Fla. 2014).  In view of the facts here, Baxter's cases are inapposite.

### 4.      Baxter's Sur-Reply Position

In arguing that Baxter's construction for "antioxidants" is overly broad, Endo cites a case that construed "antioxidant" to mean an "agent that reduces oxidative degradation," which is even broader.  *Supra* at 40-41 n.17; *Novartis Pharm. Corp. v. Par Pharm., Inc.*, No. 11-1077-RGA, 2014 WL 4364674, at *2 (D. Del. Aug. 29, 2014).  Endo also attacks Baxter's citations to the intrinsic evidence relating to sodium metabisulphite as "not persuasive" apparently because "sodium metabisulphite was commonly understood by POSAs to be an antioxidant (and therefore is also an 'antioxidant' under Endo's construction)."  *Supra* at 41.  Consistent with the intrinsic evidence and Baxter's construction, *see supra* at 37-38, a POSA would understand that "antioxidants"—like sodium metabisulphite—are "agents that inhibit oxidation of another agent."

Endo also cherry-picks Baxter's cited Groves reference because it refers to antioxidants as preventing "oxidation of the active ingredient(s)."  *Supra* at 41.  But, an "active ingredient" is in fact "another agent" in Baxter's construction.  From one side of its mouth, Endo argues that "an unrelated Par patent," **which is prior art**, "is not competent evidence of how a term should be construed," *supra* at 43-44, and from the other side of its mouth, it cites two cases that state that prior art is relevant to claim construction, *supra* at 42-43 n.19.  Endo cannot have it both ways— the Par '876 patent is indeed "competent evidence."

Contrary to Endo's assertions, and as discussed above, Endo's proposed construction in no way indicates that the Handbook is meant to be "exemplary" and not exclusive.  Endo now argues that the "real focus" of its proposed construction is:  "'antioxidants' must be construed based on how that term would be 'commonly understood' by POSAs."  *Supra* at 41-42.  This is equivalent

to saying the term has its plain and ordinary meaning.  Baxter's proposed construction, espoused in Par's own prior art patent, aligns with how the term is commonly understood by skilled artisans.

Despite its ***new*** "real focus," Endo identifies instances where Dr. Constantinides cited the Handbook (including citations to twelve members of the same INPADOC patent family in a blatant attempt to inflate the number of citations).  Dr. Constantinides acknowledges that the Handbook is a "useful reference."  1st Const. Decl. ¶¶ 52, 63.  That an expert in the field would cite the Handbook fails to resuscitate Endo's doomed construction that treats the Handbook as the exclusive source.  Indeed, Dr. Constantinides cites other useful sources, consistent with his opinion that the Handbook is not the be-all and end-all reference book for POSAs.  2nd Const. Decl. ¶ 23.  Also consistent with Dr. Constantinides' opinion, one of his references[22] cited by Endo and discussed by its expert, far from touting the authoritativeness of the Handbook, points out its failure "to address non-traditional uses of biologically 'active' excipients."  2nd Buckton Decl. Ex. 2 at 5.  Further, Dr. Constantinides' opinions regarding reducing sugars and his citation to one exemplary publication lend additional support that the exclusive reliance on the Handbook is not consistent with a POSA's understanding of "antioxidants."  Accordingly, Endo's construction fails.

**C.  "tonicity agent" / "tonicity adjusting agent"**

**1.  Endo's Opening Position**

The term "tonicity agent" or "tonicity adjusting agent" is recited in claims 1, 9, 14, and 19 of the '735 patent; claim 1 of the '026 patent; claims 1 and 16 of the '850 patent; and claims 1 and 19 of the '458 patent.

The parties have proposed the following constructions:

---

[22] Panayiotis P. Constantinides et al., *Considerations and Recommendations on Traditional and Non-Traditional Uses of Excipients in Oral Drug Products*, 3 AAPS Open 1 (2016).

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "excipient whose function is commonly understood by a person of ordinary skill in the art to be a tonicity agent, as listed in the Handbook of Pharmaceutical Excipients (7th ed.)" | "a separate chemical compound, added to the composition, that increases osmolality of the composition" |

### a.    Endo's proposed construction is consistent with the intrinsic evidence and reflects the understanding of a POSA.

Endo's construction should be adopted because, like Endo's construction of the "antioxidants" term, it is consistent with how a POSA would ordinarily understand the term and there is nothing in the intrinsic evidence to suggest that the term should carry any different meaning.  *InterDigital*, 690 F.3d at 1324; Buckton Decl. ¶¶ 36-37.

POSAs would similarly look to the Handbook to determine whether a given excipient was commonly understood to be a tonicity agent (or tonicity adjusting agent).  Buckton Decl. ¶ 34.

A POSA would also recognize that the intrinsic evidence does not give any special definition to the term "tonicity agent" (or "tonicity adjusting agent") that differs from how that term would typically be understood in the art.  Buckton Decl. ¶ 36.  Indeed, all of the exemplary "suitable" tonicity agents disclosed in the Specification were commonly understood to have that functionality.  *See, e.g.*, '735 patent at 7:9-25 (disclosing sodium chloride (as "NaCl"), glycerol, thioglycerol, mannitol, lactose, and dextrose as suitable tonicity agents).  Accordingly, Endo's proposed construction should be adopted because it reflects the plain meaning of the term as it would have been understood by a POSA.  *See Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012) ("Absent disclaimer or lexicography, the plain meaning of the claim controls."); *Novartis Pharm. Corp. v. Par Pharm., Inc.*, No. 11-1077-RGA, 2014 WL 4364674, *6-7, *6 n.9 (D. Del. Aug. 29, 2014).

2.    **Baxter's proposed construction is inconsistent with a POSA's understanding and unsupported by the intrinsic evidence.**

Baxter's proposed construction should be rejected as lacking evidentiary support and inconsistent with the understanding of a POSA.  Under Baxter's construction, even those agents not commonly known to increase the osmolality of a composition would nevertheless be considered "tonicity agents."  Similarly, Baxter's construction would improperly include agents that "increase[] osmolality of the composition" only to some incidental, de minimis extent.  The inclusion of such agents has no support in the intrinsic evidence, and a POSA would not consider an agent to be a "tonicity agent" if it only trivially increases osmolality of a composition.  Buckton Decl. ¶ 35.  *See Teleflex*, 299 F.3d at 1325.

Further, nothing in the intrinsic evidence supports Baxter's proposal that the tonicity agent must be a "separate chemical compound."  Because there is no "clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language" with respect to the term "tonicity agent" (and "tonicity adjusting agent")— i.e., its plain and ordinary meaning—and the term should not be unduly narrowed to only "separate chemical compound[s]" as Baxter proposes.  *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004).  *See also Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299-1300 (Fed. Cir. 2014) ("add[ing] words to the claim language without support in the intrinsic evidence . . . does not follow standard canons of claim construction" (internal punctuation and quotation marks omitted)).

3.    **Baxter's Answering Position**

Baxter proposes that the Court construe "tonicity agent" / "tonicity adjusting agent" in accordance with its ordinary and customary meaning as supported by the intrinsic evidence.  Endo,

however, ignores that ordinary and customary meaning, and solely relies on extrinsic evidence to support its non-construction.

a.       **Background.**

The term "tonicity agent" or "tonicity adjusting agent" appears throughout the '735, '026, '850, and '458 patent claims.  *See, e.g.*, '735 patent at claims 1, 9, 14, 19; '026 patent at claim 1; '850 patent at claims 1, 16; '458 patent at claims 1, 19.  The parties have proposed the following constructions for the terms:

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "excipient whose function is commonly understood by a person of ordinary skill in the art to be a tonicity agent, as listed in the Handbook of Pharmaceutical Excipients (7th ed.)" | "a separate chemical compound, added to the composition, that increases osmolality of the composition" |

b.       **Baxter's Proposed Construction Is Consistent with the Ordinary and Customary Meaning of "Tonicity Agent" / "Tonicity Adjusting Agent."**

A skilled artisan would understand that a "tonicity agent" or a "tonicity adjusting agent" "increases osmolality of the composition."  Const. Decl. ¶¶ 46-47.  As Endo's own expert confirms, a tonicity agent is "an excipient which is both safe and effective in adjusting the osmotic pressure of an injectable formulation."  Buckton Decl. ¶ 34.  The common specification confirms this ordinary and customary meaning by stating: "[w]ith respect to suitable salts it is contemplated that the salt is a pharmaceutically acceptable salt that can be used ***to increase tonicity*** . . . . ***The amount of tonicity adjusting agent used can be adjusted to obtain osmolality of the formulations*** in the range of 260 to 340 mOsm/kg."  '735 patent at 7:9-11, 19-24 (emphasis added).  Endo's responsive argument that Baxter's proposed construction would include agents that increase osmolality to a de minimus extent is a red herring.  The skilled artisan would certainly understand while almost anything added to a solution could increase tonicity, the term "tonicity agent" only has meaning if it is separate and apart from other components.  Const. Decl. ¶ 49.

c.     **The Claim Language Confirms That "Tonicity Agent" / "Tonicity Adjusting Agent" Is a Separate Compound, Added to the Composition.**

As discussed above with respect to the term "chelating agent," on its face, the claim language confirms that the "tonicity agent" or "tonicity adjusting agent" must be "a separate chemical compound, added to the composition."  Specifically, as set forth in representative claim 1 of the '735 patent identified above at 9-11, the "tonicity agent" is listed as one of four distinct ingredients of the "norepinephrine composition."  Having listed these claim elements separately, the clear implication is that the tonicity agent is necessarily a separate chemical compound, added to the composition.  *See, e.g.*, *Becton*, 616 F.3d at 1254.

The "further comprises" and additional claim language discussed above for "chelating agent" also clearly indicate that the "tonicity agent" / "tonicity adjusting agent" is a separate chemical compound.  Const. Decl. ¶ 49.  For example, claim 1 of the '735 patent requires "wherein the norepinephrine composition comprises norepinephrine or a salt thereof . . . in an aqueous acidic solution" and "wherein the aqueous acidic solution *further comprises* . . . a tonicity agent."  '735 patent at claim 1 (emphasis added); *see also id.* at claim 14.  This express language makes it clear that "a tonicity agent" is "a separate chemical compound, added to the composition," consistent with legal precedent regarding the term "further comprises" and "further comprising."  *See, e.g.*, *Purdue*, 2015 WL 5032650, at *14; *see also David Netzer Consulting Eng'r*, 824 F.3d at 996; *HTC v. IPCom*, 667 F.3d at 1275.

Similarly, as discussed above for "chelating agent," the claims of the '026 patent require "*admixing* an R-isomer of norepinephrine or salt thereof, a chelating agent and *a tonicity agent* into an aqueous acidic solution" and the claims of the '458 patent require "*combining* norepinephrine or a salt thereof, a chelating agent, *a tonicity adjusting agent*, and an aqueous acidic solution."  *See, e.g.*, '026 patent at claim 1 (emphasis added); '458 patent at claim 1

(emphasis added).   Again, this claim language further supports that the recited elements are "separate" ingredients that are used to prepare the claimed composition.  Const. Decl. ¶ 49.

### d.   The Common Specification Also Indicates That "Tonicity Agent" / "Tonicity Adjusting Agent" Is a Separate Compound, Added to the Composition.

Statements in the common specification further indicate that "a tonicity agent" is "a separate chemical compound, added to the composition."  For example, the common specification states "*[s]odium chloride was added* and the solution was stirred until a homogenous solution was obtained."  *See, e.g.*, '735 patent at 9:10-12 (emphasis added); *id.* at 7:9-13 ("With respect to suitable salts it is contemplated that the salt is a pharmaceutically acceptable salt that can be used to increase tonicity.  Therefore, pharmaceutically acceptable salts are contemplated, and especially NaCl . . . ."); *id.* at 7:17-18 ("[A]dditional tonicity agents *may be added* . . . ." (emphasis added).  The Tables are as instructive for "tonicity agent" and "tonicity adjusting agent" as they are for the "chelating agent" term as noted above.  *See id.* at Tables 4, 6, 11; *see also* Const. Decl. ¶ 49.

### e.   Endo's Proposed Circular Construction Is Unsupported by the Intrinsic Evidence and Improperly Incorporates Extrinsic Evidence.

Rather than providing a definition, Endo proposed construction for "tonicity agent" ignores the intrinsic record, and asks the skilled artisan to exclusively look to extrinsic evidence, namely the HPE, in order to determine what "tonicity agent" / "tonicity adjusting agent" means.  Courts have recognized the absurdity of such a construction and have flatly rejected the same.  *See Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, No. 06-1017, 2008 WL 2410420, at *3 (S.D. Ind. June 11, 2008) (rejecting claim construction of "surfactant" relying solely on identification in HPE in favor of functional definition supported by intrinsic evidence).

50

The common specification also does not direct the reader to consult the HPE to determine what a "tonicity agent" / "tonicity adjusting agent" is.[23]   Rather, as discussed above, the specification explains that tonicity agents are added to "increase tonicity" (i.e., osmolality).

Further, assuming *arguendo* that incorporating the HPE into a construction is proper (it is not), the HPE is not conclusive as to what constitutes a "tonicity agent" / "tonicity adjusting agent." Const. Decl. ¶ 52.  For example, the Patents-in-Suit identify thioglycerol and lactose as suitable tonicity agents. *See, e.g.*, '735 patent at 7:9-20.  However, the "Functional Category" sections of the HPE for thioglycerol and lactose do not identify either as tonicity agents.  HPE 2012 at 513 (identifying thioglycerol as "[a]ntimicrobial preservative; antioxidant"), 410 (identifying Lactose, Anhydrous as "[d]irect compression excipient; dry powder inhaler carrier; lyophilization aid; tablet and capsule diluent"), 415 (identifying Lactose, Monohydrate as "[d]ry powder inhaler carrier; lyophilization aid; tablet and capsule binder; tablet and capsule diluent"); Const. Decl. ¶ 52.

Endo's reliance on *Free Motion Fitness* in support of its proposed construction is misplaced at best.  While "[d]ictionaries . . . are often useful to assist in understanding the commonly understood meaning of words," "courts **may** rely on dictionary ***definitions*** when construing claim terms."  *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348 (Fed. Cir. 2005) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322 (Fed. Cir. 2005) (en banc)).  The HPE hardly provides a "dictionary definition[]" for "tonicity agent" or "tonicity adjusting agent."  Again, Endo's own expert confirms that a tonicity agent is "an excipient which is both safe and effective in adjusting the osmotic pressure of an injectable formulation" Buckton Decl. ¶ 34.  In other words,

---

[23] Not only does the common specification fail to direct the reader to consult the HPE, Par's own patents directed to injectable vasopressin formulations fail to do so as well. *See, e.g.*, U.S. Patent No. 9,919,026 at 56:5-15 (citing four texts for where "examples of pharmaceutically-acceptable excipients can be found," yet failing to cite HPE).

Endo ignores the ordinary and customary meaning, and instead relies on inconclusive extrinsic evidence. *Phillips*, 415 F.3d at 1317.

Finally, Endo's reliance on the very term ("tonicity agent") in its construction is misplaced. Courts strongly disfavor circular constructions. *See, e.g.*, *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1090 (Fed. Cir. 2003); *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997); *Lecat's Ventriloscope v. MT Tool & Mfg.*, 283 F. Supp. 3d 702, 712 (N.D. Ill. 2018) ("Plaintiff's construction is circular, providing an interpretation of 'auscultation device' that itself relies on the term 'auscultation device.'  A circular claim construction will not assist the jury as factfinder in understanding this claim term  . . . ."); *Univ. of Fla. Rsch. Found., Inc. v. Motorola Mobility LLC*, 3 F. Supp. 3d 1374, 1377 (S.D. Fla. 2014) ("This Court further finds that Plaintiffs' construction is circular and unhelpful because it does not actually define the claim.  Plaintiffs contend that 'wireless' refers to "wireless communication protocol [s] ...'  Plaintiffs are in effect using the word 'wireless' to define 'wireless.'   The use of circular reasoning constitutes improper claim construction." (citation omitted)).  For these reasons, Endo's construction should be rejected.

### 4.    Endo's Reply Position

Baxter's proposed construction of these terms, like its construction of "antioxidants," is far broader than what the intrinsic evidence and understanding in the art permit.  Although Baxter acknowledges that its construction "would include agents that increase osmolality to a de minimis extent" so long as they are "separate and apart from other components," (*supra* at 48), Baxter does not—and cannot—provide any meaningful justification for that interpretation.  Baxter's admission that "almost anything added to a solution could increase tonicity," (*id*. (emphasis added)), shows that its construction could effectively render the terms "tonicity agent" and "tonicity adjusting agent" meaningless.

As discussed, (*see supra* at 47), the intrinsic evidence also lacks any basis for Baxter's requirement that the tonicity agent be "a separate chemical compound, added to the composition." *See supra* at 47; Buckton 2nd Decl. ¶¶ 23-24.  *See Source Vagabond Sys. Ltd. v. Hydrapak*, Inc., 753 F.3d 1291, 1299 1300 (Fed. Cir. 2014) ("add[ing] words to the claim language without support in the intrinsic evidence . . . does not follow standard canons of claim construction" (cleaned up)). Conversely, Endo's construction, like its construction for the term "antioxidants," flows naturally from the application of basic claim construction principles.  *See supra* at 46; Buckton 2nd Decl. ¶¶ 25, 27.

Baxter attempts to align the facts of this case with those of Eli Lilly, (*supra* at 50), but that case is clearly distinguishable.  There, Teva's construction ("identified as a diluent in the HPE") was rejected because it (1) would have excluded preferred embodiments and (2) relied on a version of the Handbook published 10 years after filing date.  *See Eli Lilly & Co. v. Teva Pharm. USA, Inc.*, No. 1:06-cv-1017-SEB-JMS, 2008 WL 2410420, at *3 (S.D. Ind. June 11, 2008).  In contrast, the specification here discloses that preferred tonicity agents are "pharmaceutically acceptable salt[s] (e.g., NaCl)," ('735 patent at 4:48-52), and the Handbook edition to which Endo cites (the 7th) was the latest version as of the filing date.  Buckton 1st Decl. ¶ 26; Exhibit I to Buckton 1st Decl. at Cover.  Further, as discussed above regarding "antioxidants," Endo relies on the Handbook only as an exemplary source rather than the exclusive one.

Baxter's arguments that rely on unrelated Par patents, supposed "circular" reasoning, and ignoring the "commonly understood" phrase in Endo's proposed construction are inapposite for the same reasons discussed above regarding the "antioxidants" term.

## 5.    Baxter's Sur-Reply Position

Baxter's consistent constructions require that the tonicity agent be a "separate chemical compound, added to the composition."  This simply makes it clear that other claimed components

are not the "tonicity agent."  By asserting that "the intrinsic evidence . . . lacks any basis for Baxter's requirement that the tonicity agent be 'a separate chemical compound, added to the composition,'" Endo ignores Baxter's cited Federal Circuit precedent establishing that the separate listing of elements in the claims "clearly" and "strongly" implies that those elements are "distinct components." *Becton*, 616 F.3d at 1254.

Recognizing its faulty Handbook-reliant construction, Endo and its expert attempt to walk back from it by asserting that Endo "relies on the Handbook only as an exemplary source rather than the exclusive one." *Supra* at 54; *see also* 2nd Buckton Decl. ¶¶ 14-15.  However, the very words of Endo's proposed construction—"as listed in the Handbook"—indicate exclusivity.  2nd Const. Decl. ¶ 21.  Endo's construction does not recite "as listed, *e.g.*, in the Handbook" or "as listed *in references such as* the Handbook."  Repeated statements by its own expert also flatly contradict Endo's assertion.  *See, e.g.*, 1st Buckton Decl. ¶¶ 29 ("POSAs would consult the Handbook"), 30 (same), 33 ("a POSA would consult the authoritative text, the Handbook").  Endo's walk-back cannot correct the inconsistencies in the Handbook highlighted in Baxter's answering position.  *See Supra* at 39-40, 51-52.  Insisting that the Handbook is an exemplary source adds further ambiguity to Endo's already-ambiguous, proposed construction—essentially, "common tonicity agents which may or may not be listed in the Handbook."

Endo attempts to distinguish *Eli Lilly* by stating that "Teva's construction ('identified as a diluent in the HPE') was rejected because it (1) would have excluded preferred embodiments." *Supra* at 53.  For at least this same reason, Endo's construction must be rejected here.  Endo's very own construction excludes two of the six tonicity agents it identifies in its own patents, namely thioglycerol and lactose.  *Supra* at 51-52.

D.      **"large volume, polymeric, semi-permeable infusion container"**

1.      **Endo's Opening Position**

Claim 2 of the '850 patent recites a "large volume, polymeric, semi-permeable infusion container."

The parties have proposed the following constructions:

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "e.g. blow-fill-seal container or flexible IV bag" | Indefinite. |

a.      <u>**Endo's proposed construction is derived from the intrinsic evidence and aligns with a POSA's understanding of the term.**</u>

Endo's proposed construction should be adopted because it comes directly from the Specification and merely brings clarity to the term, which a POSA would readily understand. *InterDigital*, 690 F.3d at 1324.

The Specification recites "large volume polymeric, semi-permeable infusion containers (e.g., BFS [i.e., blow-fill-seal] container or flexible IV bags)." '735 patent at 8:19-21. Thus, the Patents-in-Suit expressly include blow-fill-seal containers and flexible IV bags within the scope of this term. Buckton Decl. ¶¶ 43-45; *CyDex Pharm., Inc. v. Alembic Global Holding SA*, No. 19-956, 2020 WL 6393918 (D. Del. Nov. 2, 2020); *see also Teleflex*, 299 F.3d at 1325 ("The specification may assist in resolving ambiguity where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone.").

Further, even without the above-cited passage from the Specification, a POSA would have understood both BFS containers and flexible IV bags to be "large volume, polymeric, semi-permeable infusion containers." Buckton Decl. ¶¶ 43-45.

      **b.**      <u>**A POSA would understand the meaning of the term with reasonable certainty.**</u>

A POSA reading the Patents-in-Suit[24] would understand the meaning of this term with reasonable certainty, and therefore it is not indefinite.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

The Specification states: "Once the norepinephrine formulations are filled in large volume polymeric, semi-permeable infusion containers (e.g., BFS container or flexible IV bags), the containers can optionally be layered or covered with a secondary packaging system including an aluminum pouch or other oxygen scavenger."  '735 patent at 8:19-24.  A POSA reading that passage would know what BFS containers and flexible IV bags are, and would therefore understand what is meant by "large volume, polymeric, semi-permeable infusion container" with reasonable certainty.  Buckton Decl. ¶¶ 43-45.  Even absent an express definition, the meaning of the term is nonetheless "fairly inferable" from the Patents-in-Suit, particularly in light of those examples provided in the Specification, and therefore the term is not indefinite.  *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004).

      **2.**      **Baxter's Answering Position**

Baxter maintains that "large volume, polymeric, semi-permeable infusion container" is indefinite, and reserves its right to advance indefiniteness theories during expert discovery.

      **a.**      <u>**Background.**</u>

Endo offers the following proposed construction for "large volume, polymeric, semi-permeable infusion container" which appears in claim 2 of the '850 patent:

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "e.g. blow-fill-seal container or flexible IV bag" | Indefinite |

---

[24] Notably, other than the claim in which this term appears, Baxter did not cite to any intrinsic evidence to support its indefiniteness position.

### b.      Endo's Proposed Construction Maintains Ambiguity.

In lieu of a construction, Endo once again offers up examples "e.g. blow-fill-seal container or flexible IV bag."  Again, examples do not form a proper construction.  *See, e.g.*, *Transcenic*, 7 F. Supp. 3d at 412; *Lambeth*, 2017 WL 4681328, at *6; *In re Maxim*, 2013 WL 6628762, at *34; *Oplus*, 2013 WL 11521845, at *5.

Endo cites *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) in arguing that "the Patents-in-Suit expressly include blow-fill-seal containers and flexible IV bags within the scope of this term."  *Supra* at 55. Unlike in *Teleflex*, the specification's identification of "blow-fill-seal containers and flexible IV bag" in the common specification does not "assist in resolving ambiguity" of at least the "semi-permeable" term.  *Id.*  For example, the skilled artisan would not understand whether the container is semi-permeable to oxygen, air, or water, or something else.  Const. Decl. ¶ 65.  For these reasons, Endo's proposed construction fails.

### 3.      Endo's Reply Position

Baxter provides no analysis in support of its indefiniteness position on this term.  *See supra* at 56-57.  Endo reserves the right to respond to any indefiniteness theories raised by Baxter once the parties have had the opportunity to engage in expert discovery regarding those theories.

Baxter's argument that the Specification does not resolve supposed ambiguity around the term "semi-permeable" is unpersuasive because a POSA would not question whether semi-permeable refers "to oxygen, air, or water, or something else."  *Id.*  Rather, in the context of the claimed invention, a POSA would understand that "semi-permeable" means that the container allows a limited vapor exchange, such that a very small amount of water vapor may be able to pass through the plastic in response to ambient humidity.  Buckton 2nd Decl. ¶ 53.  The Specification's

examples of blow-fill-seal containers and flexible IV bags—both of which a POSA would be familiar with—comport with that understanding.  Buckton 1st Decl. ¶¶ 43-45.

### 4. Baxter's Sur-Reply Position

Baxter maintains that this term is indefinite.  Endo fails to explain why the specification's blow-fill-seal containers and flexible IV bags resolve the ambiguity of the term "semi-permeable."

## E. "norepinephrine" / "norpepinephrine"

### 1. Endo's Opening Position

The term "norepinephrine" or "norpepinephrine"[25] is recited in claims 1-4, 12-14, and 18 of the '657 patent; claims 1, 7-8, 11, 13-15, and 18-19 of the '436 patent; claims 1, 4-6, 10-16, and 20-22 of the '735 patent; claims 1-10 and 18 of the '026 patent; claims 1-19 of the '850 patent; and claims 1, 11-16, and 21-23 of the '458 patent.

The parties have proposed the following constructions:

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "norepinephrine or a salt thereof" | "norepinephrine and pharmaceutically acceptable salts (e.g., norepinephrine bitartrate) and prodrugs thereof" |

### a. Endo's proposed construction is consistent with the deliberately chosen wording of the claims.

Endo's construction should be adopted because it aligns with the express language and syntax of the claims.  *See Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (claim construction "must begin and remain centered on the language of the claims themselves").

---

[25] The term "norpepinephrine" in the Patents-in-Suit, (*see, e.g.*, '735 patent at claim 22), is merely a typographical error that is clearly understood to mean "norepinephrine."

The Specification states that "reference to the term norepinephrine should be interpreted broadly to include pharmaceutically acceptable salts and prodrugs thereof." *See*, *e.g.*, '735 patent at 4:22-25.  The asserted claims of the '735, '026, '850, and '458 patents, however, instead each recite "norepinephrine *or* a salt thereof."  Thus, if the patentees had intended for the scope of a claim to include norepinephrine *and* pharmaceutically acceptable salts *and* prodrugs thereof, they could have claimed simply "norepinephrine"; they did not do so, however, and the claims must be "interpreted with an eye toward giving effect to all terms in the claim," including the phrase "or a salt thereof." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008).  *See also In re Gabapentin Patent Litig.*, 503 F.3d 1254, 1263 (Fed. Cir. 2007); Buckton Decl. ¶¶ 47-51.  By expressly claiming "norepinephrine or a salt thereof," rather than "norepinephrine" or "norepinephrine *and* a salt thereof," the patentees made clear that the scope of the asserted claims of those patents includes either norepinephrine or salts of norepinephrine, but not all three of norepinephrine, pharmaceutically acceptable salts thereof, and prodrugs thereof.  A POSA would recognize that the wording of the claims, including the use of "or" in the disjunctive sense, serves to narrow the "broad[]" interpretation of "norepinephrine" discussed in the Specification. *See GE v. ITC*, 685 F.3d 1034, 1041 (Fed. Cir. 2012) ("[A] possibly broader disclosure accompanied by an explicit narrow claim shows the inventor's selection of the narrow claim scope.").

Additional statements in the Specification further show that "norepinephrine" should be understood to refer disjunctively to norepinephrine or salts thereof.  The Specification demonstrates, for example, that the patentees recognized a functional distinction between norepinephrine and salts of norepinephrine. *See*, *e.g.*, '735 patent at 6:34-39 ("However, the inventors have further discovered that where the norepinephrine is provided as the norepinephrine bitartrate salt, a buffer can advantageously be omitted and the pH can be adjusted with suitable

acid and/or base as is well known in the art."). Such statements demonstrate that the patentees used "or" in the claims in its "common usage as designating alternatives," and "there is no basis whatsoever for believing that" Endo "intended its usage of 'or' somehow to embrace 'and.'" *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1331 (Fed. Cir. 2001). *See also SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1199-1200 (Fed. Cir. 2013).

### b.  Baxter's proposed construction ignores the patentees' claim language.

Baxter's proposed construction should be rejected because it ignores the patentees' deliberate choice of claim language. For example, while the Specification does disclose that "norepinephrine" should be interpreted to include "pharmaceutically acceptable salts and prodrugs thereof," the recitation of "norepinephrine or a salt thereof" in the claims is clearly intended to cover only a subset (i.e., norepinephrine and salts thereof) of the interpretation discussed in the Specification. *See Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1365 (Fed. Cir. 2003) ("Courts may not rewrite claim language based on what has been omitted from a claim . . . .").

### 2.  Baxter's Answering Position

Baxter proposes that the Court construe "norepinephrine" / "norpinephrine" according to the express lexicography of the Patents-in-Suit. Endo ignores this express lexicography.

### a.  Background.

The term "norepinephrine" appears throughout the patent claims. *See, e.g.*, '657 patent at claims 1-4, 12-14, 18; '436 patent at claims 1, 7-8, 11, 13, 15, 18-19; '735 patent at claims 1, 4-6, 10-16, 20-22; '026 patent at claims 1-10, 18; '850 patent at claims 1-19; '458 patent at claims 1, 11, 15-16, 21-23. The parties agree that the term "norpinephrine," which appears in claim 22 of the '735 patent, is a typographical error that is understood to mean "norepinephrine" in the context of the claims. The parties have proposed the following constructions for the terms:

| Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|
| "norepinephrine or a salt thereof" | "norepinephrine and pharmaceutically acceptable salts (e.g., norepinephrine bitartrate) and prodrugs thereof" |

The parties appear to agree that at a minimum the term "norepinephrine" includes "norepinephrine" and a salt or pharmaceutically acceptable salt thereof.  To the extent Endo agrees that that includes norepinephrine bitartrate, the sole remaining dispute centers around whether prodrugs should be included.

        b.      **Baxter's Proposed Construction Directly Applies The Common Specification's Lexicography.**

Baxter's proposed construction tracks the clear definition provided in the common specification: "[a]s used herein, reference to the term **norepinephrine** should be interpreted broadly to include **pharmaceutically acceptable salts and prodrugs thereof**." '735 patent at 4:22-25 (emphasis added).  Const. Decl. ¶ 67.  The specification further states: "[o]f course, it should also be appreciated that the **norepinephrine** may be a salt of any suitable and pharmaceutically acceptable form, including mineral salts (e.g., HCl salt) and organic salts (**e.g., bitartrate**)." *Id.* at 6:24-26 (emphasis added).  Where, as here, the inventors have defined a term in the patent, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316; *see also Braintree Lab'ys Inc. v. Novel Lab'ys, Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) ("Under our precedent, the patentee's lexicography must govern the claim construction analysis.").  Given this unmistakable lexicography, the Court should construe "norepinephrine" as Baxter proposes.

        c.      **Endo's Proposed Construction Ignores This Lexicography.**

Instead of simply adopting the express definition in the common specification, Endo takes this Court on a long and complicated grammar tutorial on "syntax" and "conjunctions" to arrive at a construction that is inconsistent with the lexicography. *Supra* at 59-61.  But, the clear and unmistakable lexicography ultimately overcomes Endo's alleged concerns about grammar and

syntax.  *See, e.g.*, *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) ("[T]he doctrine of claim differentiation creates only a presumption, which can be overcome by strong contrary evidence such as definitional language in the patent . . . .").

Further, to the extent that Endo is attempting to salvage the claims from the invalidity perspective by deleting reference to "prodrugs," that too is improper.  *See, e.g.*, *Biogen MA Inc. v. EMD Serono, Inc.*, 976 F.3d 1326, 1335-36 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 87 (2021) (patentee, to avoid a finding of anticipation, could not argue that the claimed polypeptide had to have a three dimensional fold, rather than a mere linear amino sequence, since that narrow construction was contrary to the broader lexicographic definition provided in the patent specification that expressly defined "Polypeptide" as being a "linear array of amino acids").

Baxter's proposed construction is the only construction that properly addresses the intrinsic evidence and the patentee's lexicographic choice.  *Martek Biosciences Corp. v. Nutrinova, Inc*., 579 F.3d 1363, 1380 (Fed. Cir. 2009) ("When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls.").

### 3.     Endo's Reply Position

Consistent with the principle that claims are "interpreted with an eye toward giving effect to all terms in the claim," Endo's construction of "norepinephrine" focuses on how the term should be understood in the claims when it appears within the phrase "norepinephrine or a salt thereof." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008).  Endo's position is that the phrase "norepinephrine or a salt thereof" signals a narrower set than the "norepinephrine and pharmaceutically acceptable salts and prodrugs thereof" discussed in the Specification.  *See GE v. ITC*, 685 F.3d 1034, 1041 (Fed. Cir. 2012) ("[A] possibly broader disclosure accompanied by an explicit narrow claim shows the inventor's selection of the narrow claim scope."); Buckton 2nd Decl. ¶ 54.  The phrase's use of "or" rather than "and" also signals that the limitation could be

satisfied either by norepinephrine (i.e., in free base form) or by a norepinephrine salt.  *See Kustom*

*Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1331 (Fed. Cir. 2001).

Baxter's construction should be rejected because it is inconsistent with the principle that

"[c]ourts may not rewrite claim language based on what has been omitted from a claim."  *Resonate*

*Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1365 (Fed. Cir. 2003).  Baxter's construction

ignores the applicants' deliberate choice of claim language, namely the choice to recite

"norepinephrine or salts thereof" but not "prodrugs," as well as the choice to use the disjunctive

"or" rather than the conjunctive "and."

### 4.    Baxter's Sur-Reply Position

Endo's argument that "prodrugs thereof" should be excluded from the construction is in

contravention of the patent's clear lexicography.  *Supra* at 59-60.  Baxter in no way rewrites claim

language in its proposed construction of "norepinephrine."  *Supra* at 63.  Rather, the explicit

definition from the specification is incorporated into the claims.  *Supra* at 61-62.  The "or a salt

thereof" language remains intact in both proposed constructions.

## F.    Range Terms

### 1.    Endo's Opening Position

The Asserted Claims recite various terms relating to ranges of amounts and concentrations

(the "Range Terms").  The Range Terms, relevant claims, and parties' proposed constructions are

as follows:

| Range Term / Claim(s) | Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|---|
| "an amount of between 0.6 wt % and 1.2 wt %" ('436 patent cl. 1; '735 patent cls. 9, 19; '026 patent cl. 1; '850 patent cl. 1; '458 patent cl. 1) | Plain and ordinary meaning, i.e., "an amount of between 0.6 wt % and 1.2 wt %" | "an amount of between exactly 0.6 wt % and exactly 1.2 wt %" |

| Range Term / Claim(s) | Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|---|
| "in an amount of between 1 µg/ml and 100 µg/ml" ('436 patent cl. 1; '735 patent cl. 14; '026 patent cl. 1; '850 patent cl. 1) | Plain and ordinary meaning, i.e., "in an amount of between 1 µg/ml and 100 µg/ml" | "in an amount of between exactly 1 µg/ml and exactly 100 µg/ml" |
| "at a concentration of between 10 µg/ml and 100 µg/ml" ('657 patent cls. 7, 9; '436 patent cls. 4, 7, 13; '735 patent cls. 1, 8, 14; '026 patent cl. 15) | Plain and ordinary meaning, i.e., "at a concentration of between 10 µg/ml and 100 µg/ml" | "at a concentration of between exactly 10 µg/ml and exactly 100 µg/ml" |
| "at a concentration of between 1 µg/ml and 100 µg/ml" ('735 patent cl.1) | Plain and ordinary meaning, i.e., "at a concentration of between 1 µg/ml and 100 µg/ml" | "at a concentration of between exactly 1 µg/ml and exactly 100 µg/ml" |
| "between 10 µg/ml and 100 µg/ml" ('026 patent cl. 1) | Plain and ordinary meaning, i.e., "between 10 µg/ml and 100 µg/ml" | "between exactly 10 µg/ml and exactly 100 µg/ml" |
| "at a concentration of between 1 µg/ml and 10 µg/ml" ('026 patent cl. 1) | Plain and ordinary meaning, i.e., "at a concentration of between 1 µg/ml and 10 µg/ml" | "at a concentration of between exactly 1 µg/ml and exactly 10 µg/ml" |
| "in an amount of between 10 µg/ml and 100 µg/ml" ('850 patent cl. 1) | Plain and ordinary meaning, i.e., "in an amount of between 10 µg/ml and 100 µg/ml" | "in an amount of between exactly 10 µg/ml and exactly 100 µg/ml" |
| "in an amount of between 10 µg/ml and 100 µm/ml" ('458 patent cl. 1) | Plain and ordinary meaning, i.e., "in an amount of between 10 µg/ml and 100 µg/ml" | "in an amount of between exactly 10 µg/ml and exactly 100 µg/ml" |
| "in an amount of between 1 µg/ml and 100 µm/ml" ('458 patent cl. 1) | Plain and ordinary meaning, i.e., "in an amount of between 1 µg/ml and 100 µg/ml" | "in an amount of between exactly 1 µg/ml and exactly 100 µg/ml" |

a.   **Endo's proposed constructions align with the intrinsic evidence, including the relevant and express disclosures in the Specification.**

Endo's constructions of the Range Terms should be adopted because they reflect the plain and ordinary meaning of the terms and align with the intrinsic evidence as it would be read by a POSA. *InterDigital*, 690 F.3d at 1324.

For example, the Specification states that numbers recited in the claims "are approximations" that "are reported as precisely as practicable" in light of various causes of imprecision:

> In some embodiments, the numbers expressing quantities of ingredients, properties such as concentration, reaction conditions, and so forth, used to describe and claim certain embodiments of the invention are to be understood as being modified in some instances by the term 'about.'   Accordingly, in some embodiments, the numerical parameters set forth in the written description and attached claims are approximations that can vary depending upon the desired properties sought to be obtained by a particular embodiment.   In some embodiments, the numerical parameters should be construed in light of the number of reported significant digits   and   by   applying   ordinary   rounding   techniques. Notwithstanding that the numerical ranges and parameters setting forth the broad scope of some embodiments of the invention are approximations, the numerical values set forth in the specific examples are reported as precisely as practicable.   The numerical values presented in some embodiments of the invention may contain certain errors necessarily resulting from the standard deviation found in their respective testing measurements.

('735 patent at 20:62-21:14.)   Nothing in the intrinsic evidence suggests that any of the Range Terms are not among the "numerical parameters" discussed in the above passage.   A POSA would know that absolute precision is simply not possible, for example, due to issues such as "the number of reported significant digits," "ordinary rounding techniques," and "errors necessarily resulting from the standard deviation found in . . . testing measurements." Buckton Decl. ¶ 56.   Accordingly, a POSA would understand the numerical endpoints of each of the Range Terms as approximations.

Buckton Decl. ¶¶ 56-58.  This is also consistent with the plain and ordinary meaning.  Buckton Decl. ¶ 57.

      **b.**      <u>**Baxter's proposed constructions directly conflict with the intrinsic evidence and should be rejected.**</u>

Baxter's proposed constructions of the Range Terms would improperly insert the word "exactly" before each of the numerical values in each term.  This is plainly a litigation-driven, unsupported attempt to unduly narrow the literal scope of the Range Terms—whose endpoints, as explained above, "are reported as precisely as practicable" but are nonetheless "approximations that can vary," ('735 patent at 20:62-21:14)—and remove any scope of equivalents from the Range Terms.  *See Thorn EMI N. Am., Inc. v. Intel Corp.*, 936 F. Supp. 1186, 1198-99 (D. Del. 1996), *aff'd*, 157 F.3d 887 (Fed. Cir. 1998) (rejecting "litigation-driven constructions" that had "little support in the claim language, the specification, the prosecution history, or the extrinsic evidence").  As the Federal Circuit has repeatedly held, recitation of a numerical range in a claim limitation is not intended to preclude invocation of the doctrine of equivalents.  *See, e.g.*, *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1291 (Fed. Cir. 2010); *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1378 (Fed. Cir. 2007); *Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1107-08 (Fed. Cir. 2002).

To insert the word "exactly" would also be directly at odds with the Specification, which makes clear that numerical values in the claims—including the endpoints of the Range Terms— are to be understood as approximations.  *Cf. Fresenius Kabi USA, LLC v. Fera Pharm., LLC*, No. 15-cv-3654 (KM)(MAH), 2016 WL 5109142, *7 (D.N.J. Sept. 20, 2016) (finding that terms "less than 0.20%," "at most 0.20%," and "at most 0.15%" did not require construction, and rejecting proposed constructions (such as "less than or equal to 0.1999999%") that "ignore obvious practical limits and inject a level of faux precision that can only create mischief").  *See also Osram GmbH*

*v. ITC*, 505 F.3d 1351, 1357 (Fed. Cir. 2007) ("The patent specification is the primary resource for determining how an invention would be understood by persons experienced in the field."); *Phillips*, 415 F.3d at 1315-17 (specification "is always highly relevant to the claim construction analysis" and "is the single best guide to the meaning of a disputed term"); *Adams*, 616 F.3d at 1292-93 (rejecting construction of "at least 3500" that would "set[] forth an absolute minimum value").

### 2.     Baxter's Answering Position

Baxter proposes that the range terms should be construed in accordance with the intrinsic evidence.  Endo seeks to improperly broaden that interpretation.

### a.     __Background__

The range terms appear throughout the asserted claims.   The parties' proposed constructions are below:

| Range Term / Claim(s) | Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|---|
| "an amount of between 0.6 wt % and 1.2 wt %" ('436 patent at claim 1; '735 patent at claims 9, 19; '026 patent at claim 1; '850 patent at claim 1; '458 patent at claim 1) | Plain and ordinary meaning, i.e., "an amount of between 0.6 wt % and 1.2 wt %" | "an amount of between exactly 0.6 wt % and exactly 1.2 wt %" |
| "in an amount of between 1 µg/ml and 100 µg/ml" ('436 patent at claim 1; '735 patent at claim 14; '026 patent at claim 1; '850 patent at claim 1) | Plain and ordinary meaning, i.e., "in an amount of between 1 µg/ml and 100 µg/ml" | "in an amount of between exactly 1 µg/ml and exactly 100 µg/ml" |
| "at a concentration of between 10 µg/ml and 100 µg/ml" ('657 patent at claims 7, 9; '436 patent at claims 4, 7, 13; '735 patent at claims 1, 8, 14; '026 patent at claim 15) | Plain and ordinary meaning, i.e., "at a concentration of between 10 µg/ml and 100 µg/ml" | "at a concentration of between exactly 10 µg/ml and exactly 100 µg/ml" |
| "at a concentration of between 1 µg/ml and 100 µg/ml" ('735 patent at claim 1) | Plain and ordinary meaning, i.e., "at a concentration of between 1 µg/ml and 100 µg/ml" | "at a concentration of between exactly 1 µg/ml and exactly 100 µg/ml" |

| Range Term / Claim(s) | Endo's Proposed Construction | Baxter's Proposed Construction |
|---|---|---|
| "between 10 μg/ml and 100 μg/ml" ('026 patent at claim 1) | Plain and ordinary meaning, i.e., "between 10 μg/ml and 100 μg/ml" | "between exactly 10 μg/ml and exactly 100 μg/ml" |
| "at a concentration of between 1 μg/ml and 10 μg/ml" ('026 patent at claim 14) | Plain and ordinary meaning, i.e., "at a concentration of between 1 μg/ml and 10 μg/ml" | "at a concentration of between exactly 1 μg/ml and exactly 10 μg/ml" |
| "in an amount of between 10 μg/ml and 100 μg/ml" ('850 patent at claim 1) | Plain and ordinary meaning, i.e., "in an amount of between 10 μg/ml and 100 μg/ml" | "in an amount of between exactly 10 μg/ml and exactly 100 μg/ml" |
| "in an amount of between 10 μg/ml and 100 μm/ml" ('458 patent at claim 1) | Plain and ordinary meaning, i.e., "in an amount of between 10 μg/ml and 100 μg/ml" | "in an amount of between exactly 10 μg/ml and exactly 100 μg/ml" |
| "in an amount of between 1 μg/ml and 100 μm/ml" ('458 patent at claim 1) | Plain and ordinary meaning, i.e., "in an amount of between 1 μg/ml and 100 μg/ml" | "in an amount of between exactly 1 μg/ml and exactly 100/ml" |

**b.** **Baxter's Proposed Constructions Establish Numerical Precision.**

Baxter's proposed constructions for the Range Terms should be adopted because the Courts have made it clear that when "qualifying language" (such as the term "about") is employed for certain claim limitations, but is omitted for others, those limitations where the qualifying language is omitted should be construed with "numerical precision." *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1381 (Fed. Cir. 2000) ("This construction, assigning numerical precision to composition ranges, is particularly appropriate when other variables in the same claims explicitly use qualifying language."); *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1365 (Fed. Cir. 2014) ("[H]ad the inventors desired the average particle diameter to include a margin of error, they could easily have included the word 'about' in the claim language."). Each of the Patents-in-Suit contains claims with "qualifying language." *See, e.g.*, '657 patent at claims 12-14 ("wherein the norepinephrine is present at a concentration of *about* 16 μg/ml, *about* 32 μg/ml, or *about* 64 μg/ml" (emphasis added)); *id.* at claim 15 ("75% *(+/−5%)* relative humidity" (emphasis added)); '436 patent at claims 8, 15 ("wherein the norepinephrine is present at a concentration of

16 µg/ml *(+/−10%)*, 32 µg/ml *(+/−10%)*, or 64 µg/ml *(+/−10%)*" (emphasis added)), claim 9

("75% *(+/−5)* relative humidity" (emphasis added)); '735 patent at claim 1 ("wherein the

norepinephrine or a salt thereof in the norepinephrine composition comprises at least ***about*** 90%

R-isomer of norepinephrine" (emphasis added)), claims 4, 10-15, 20-22 ("about"); '026 patent at

claims 2-8, 10, 13 ("about" and "25±*2°* C. and 60±*5%* relative humidity" (emphasis added)); '850

patent at claims 1, 13, 18, 19 ("about"); '458 patent at claims 1, 13, 16, 21-23 ("about").  In view

of the extensive use of qualifying language in the Patents-in-Suit, "[h]ad the inventors desired the

[Range Terms] to include a margin of error, they could easily have included the word "about" [or

other qualifying language] in the claim language."  *See Takeda*, 743 F.3d at 1365.

Endo solely cites the below passage from the shared specification in support of its

construction:

> In some embodiments, the numbers expressing quantities
> of ingredients, properties such as concentration, reaction
> conditions, and so forth, used to describe and claim certain
> embodiments of the invention are to be understood as being
> modified in some instances by the term "about." Accord-
> ingly, in some embodiments, the numerical parameters set

> forth in the written description and attached claims are
> approximations that can vary depending upon the desired
> properties sought to be obtained by a particular embodiment.
> In some embodiments, the numerical parameters should be
> construed in light of the number of reported significant digits
> and by applying ordinary rounding techniques. Notwith-
> standing that the numerical ranges and parameters setting
> forth the broad scope of some embodiments of the invention
> are approximations, the numerical values set forth in the
> specific examples are reported as precisely as practicable.
> The numerical values presented in some embodiments of the
> invention may contain certain errors necessarily resulting
> from the standard deviation found in their respective testing
> measurements.

*Supra* at 65 (quoting '735 patent at 20:62 – 21:14).  Endo also states: "[n]othing in the intrinsic evidence suggests that any of the Range Terms are not among the 'numerical parameters' discussed in the above passage."  *Id.*  Yet, the passage explicitly states, "the numbers expressing . . . properties such as concentration . . . used to . . . claim certain embodiments of the invention are to be understood as being modified ***in some instances*** by the term 'about.'"  '735 patent at 20:62 – 21:14 (emphasis added).  Again, the following claims ***expressly*** use the term "about."  *See, e.g.*, '657 patent at claims 12-14; '735 patent at claims 1, 4, 10-15, 20-22; '026 patent at claims 2-8, 10, 13; '850 patent at claims 1, 13, 18, 19; '458 patent at claims 1, 13, 16, 21-23.  Accordingly, a skilled artisan would understand that the patentee purposefully included "about" with respect to certain terms and failed to use "about" for the Range Terms.  *See, e.g.*, '850 patent at claim 1 ("an amount of between 0.6 wt % and 1.2 wt %" (Range Term); "wherein the sterile, ready-to-administer, packaged norepinephrine composition comprises at least ***about*** 90% R-isomer of norepinephrine" (emphasis added)); '458 patent at claim 1 ("an amount of between 0.6 wt % and 1.2 wt %" (Range Term); "wherein the sterile ready-to-administer norepinephrine composition comprises at least ***about*** 90% R-isomer of norepinephrine" (emphasis added).

### c.   Endo's Proposed Construction Incorporates Ambiguity.

While "absolute precision" of "numerical parameters" may not be possible, claim constructions that precisely define the terms in view of the express claim language certainly are. Baxter's proposed constructions for the Range Terms include "numerical precision," as mandated by the Federal Circuit, as opposed to Endo's ambiguous "plain and ordinary meaning" proposal. *See Jeneric/Pentron*, 205 F.3d at 1381; Const. Decl. ¶ 72.  Endo's proposed constructions for the Range Terms should be rejected.

### 3.      Endo's Reply Position

Each of the Range Terms is clear on its face, so "consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331-32 (Fed. Cir. 2001).  No such deviations are specified here.  The Specification's mention that some numerical values should be understood to be modified with the term "about," (*see* '735 patent at 20:62-21:14), simply reflects what a POSA would have understood the Range Terms to mean; it does not represent a deviation from the plain and ordinary meaning.  Buckton 2nd Decl. ¶¶ 55-57.  Endo's construction should therefore be adopted.

Conversely, Baxter's addition of the word "exactly" before each of the recited numerical values of the Range Terms is a clear attempt to use the claim construction process to improperly narrow the claim scope in service of Baxter's noninfringement arguments—rather than bring clarity to the claim language.  In particular, the goal of Baxter's proposed constructions of the Range Terms seems to be to foreclose Endo from asserting infringement under the doctrine of equivalents.  None of Baxter's citations to uses of "qualifying language" in the claims, however, relate to concentration ranges as the Range Terms do; instead, Baxter points to single values of concentrations, or to entirely different measurements such as relative humidity and isomer content. *See* Ans. Br. at 28.  Baxter has thus failed to explain why the word "exactly" should be imported into the Range Terms in contradiction with the Specification and the understanding of a POSA. Arriving at the correct construction—i.e., the plain and ordinary meaning as proposed by Endo— should not be influenced by Baxter's desire to escape infringement liability.  *See*, *e.g.*, *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1291 (Fed. Cir. 2010); *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1378 (Fed. Cir. 2007); *Abbott Labs.*, 287 F.3d at 1107-08 (Fed. Cir. 2002).

Baxter's cited cases are distinguishable.  For example, in *Jeneric/Pentron*, restriction of the claimed range to precisely the recited values was proper because the applicant had "rel[ied] on the precise ranges of the claims to distinguish itself from prior art during prosecution" but then sought to "construe the ranges more broadly during [the] infringement action."  *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1381-82 (Fed. Cir. 2002).  The similar holding in *Takeda* was also based on "the inventors distinguish[ing] the claimed invention over a potentially invalidating prior art reference" based on the reference's failure to disclose a value within the precise range, which showed that the inventors had consistently drawn a clear "dividing line" to define the scope of their invention.  *Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*, 743 F.3d 1359, 1364-65 (Fed. Cir. 2014).  Here, the prosecution history does not contain any instance where the applicant relied on the ranges recited in the Range Terms to avoid the prior art, so the plain and ordinary meaning—which, as the Specification explains, acknowledges that the recited values are approximate—controls.

### 4.    Baxter's Sur-Reply Position

Endo argues that "the prosecution history does not contain any instance where the applicant relied on the ranges recited in the Range Terms to avoid the prior art."  *Supra* at 73.  This is in direct contravention of Endo's earlier statement attempting to rebut Baxter's "chelating agent" prosecution history argument.  There, Endo stated, "the sentence from the applicant's response that Baxter cites discusses additional elements, such as ***the use of particular concentration ranges of norepinephrine and the chelating agent***, and also recites a particular pH range."  *Supra* at 24 (emphasis added).  These "particular concentration ranges of norepinephrine and the chelating agent" are two of the disputed Range Terms.  Moreover, there is no requirement that "qualifying language" must be applied to concentration ranges as Endo argues, and Endo cites no case law to support its position.  *Supra* at 71.

*/s/ Steven J. Fineman*
Steven J. Fineman (#4025)
Kelly E. Farnan (#4395)
Nicole K. Pedi (#6236)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
fineman@rlf.com
farnan@rlf.com
pedi@rlf.com

*Attorneys for Endo Ventures Limited,*
*Par Sterile Products, LLC and Nevakar*
*Injectables, Inc.*

OF COUNSEL:

David H. Silverstein
Ross E. Blau
AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street, 22nd Floor
New York, NY 10036
(212) 728-2200

Aziz Burgy
Ashton Copeland
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700

Dated:  July 29, 2022

*/s/ Philip A. Rovner*
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for*
*Baxter Healthcare Corporation.*

OF COUNSEL:

William A. Rakoczy
Paul J. Molino
Tara M. Raghavan
Conly S. Wythers
Steven J. Birkos
Greg L. Goldblatt
RAKOCZY MOLINO MAZZOCHI
SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60654
(312) 222-6300